257 F.3d 171 (2nd Cir. 2001)
 UGO CASTELLANO, Plaintiff-Appellant,
v.
YOUNG & RUBICAM, INC., Defendant-Appellee.
 Docket No. 00-7803
August Term 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: March 19, 2001
Decided: July 19, 2001
 
 Castellano was an employee shareholder of Young & Rubicam (Y&R), a closely-held corporation. Shortly after Castellano resigned from the firm and resold his shares to Y&R, it entered into a leveraged recapitalization that reaped valuable rewards for shareholders. Castellano brought federal and state claims based both on Y&R's alleged misrepresentations regarding the leveraged recapitalization and its failure to inform him of various negotiations and decisions that preceded the recapitalization. The district court dismissed all claims on Y&R's motion for summary judgment, based on Castellano's failure to show materiality as to some claims, reliance as to others and loss causation as to the remainder.
 Affirmed in part, vacated in part and remanded.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 VICTOR GENECIN, New York, NY (Pavia & Harcourt, Richard L. Mattiaccio, Paul B. Lyons, of counsel), for Plaintiff-Appellant.
 LAWRENCE B. FRIEDMAN, New York, NY (Cleary, Gottlieb, Steen & Hamilton), for Defendant-Appellee.
 Before: FEINBERG, NEWMAN and SACK, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 Plaintiff Ugo Castellano appeals from a grant of summary judgment by the United States District Court for the Southern District of New York (Sidney H. Stein, J.) to defendant Young & Rubicam (Y&R). The appeal principally raises questions of materiality and loss causation under the federal securities laws. We affirm in part and reverse and remand in part for further proceedings.
 
 I. Background
 A. Castellano's Departure from Y&R
 
 2
 Y&R is an international advertising agency. For many years, it employed Castellano in various management positions in its offices in Brazil and Italy. Beginning in 1984, Castellano served as the Chief Executive Officer of Y&R Italia S.p.A. In 1993, however, relations between Castellano and Y&R began to sour, apparently as the result of a criminal investigation of allegations that Castellano had bribed an Italian health official in connection with an AIDS-prevention advertising campaign. Y&R's internal investigation of these allegations did not produce sufficient evidence to warrant terminating Castellano for cause, but Y&R began negotiating with Castellano in an effort to persuade him to resign. These negotiations continued for over two years, eventually resulting in Castellano's resignation on April 1, 1996.
 
 
 3
 Y&R was at this time a privately-held corporation, owned by a select group of employees, and had been since its founding. Prior to his resignation, Castellano was one of the largest Y&R stockholders, owning approximately 1.2% of all outstanding equity at the time he resigned and holding both common and preferred stock. The Y&R Common Stockholders Agreement provided that no shares could be sold or transferred without first offering them to Y&R. It also provided that if a shareholder's employment with Y&R should end, Y&R had an option to purchase the holder's shares for their book value as of the end of the preceding fiscal year. Book value was defined as Y&R's consolidated net income, plus or minus certain specified adjustments, divided by the aggregate number of equity units and options outstanding. Y&R's Preferred Shareholders Agreement provided that a preferred stockholder's employment with Y&R could only be terminated for cause or with one year's notice. There was no public market for Y&R's stock.
 
 
 4
 Castellano negotiated his resignation with the Chairman of Y&R, Peter Georgescu, the Vice Chairman, Alan Sheldon, and the General Counsel, Stephanie Abramson. Georgescu, Sheldon and Abramson were also Y&R equityholders and together had effective control over Y&R decision making.
 
 
 5
 Eventually, the negotiations focused on the terms under which Y&R would buy back Castellano's stock. Under the Common Stockholder's Agreement, Y&R was permitted to pay a departing employee for his stock in installments over five years, with market-rate interest. Castellano was interested in receiving the benefit of the projected increases in the book value of Y&R's stock through December 31, 1997. As a result, Y&R's negotiators agreed that if Castellano resigned in 1996 and received 1996 book value for his shares, Y&R would make its installment payments to Castellano at a higher-than-market interest rate, thus effectively compensating Castellano for not benefitting from the 1997 projected increase in book value. Castellano was also concerned that by retiring immediately, he would lose the opportunity to profit as an equityholder if Y&R went public. According to Castellano, when he raised these concerns with Sheldon in January 1996, Sheldon assured him the company was not going to go public and that "nothing was going to change in the near future." Nevertheless, Castellano asked for and received price protection in the event of an underwritten initial public offering (IPO): if an IPO occurred before December 31, 1996, Castellano would receive 100% of the difference between the book value of his stocks and the IPO price, and in the event of an IPO during 1997, he would receive 50% of this difference. With this agreement in place, Castellano resigned on April 1, 1996, and Y&R exercised its option to repurchase his shares on the same day, at book value of $48.20 per share.
 
 B. Y&R's Exploration of Restructuring
 
 6
 Castellano soon came to regret his decision to resign from Y&R. Unknown to Castellano, while he was negotiating his resignation, the individuals negotiating with Castellano on behalf of Y&R were also exploring various options for restructuring the company. In March 1995, Castellano had received a letter from Georgescu stating, "As a private company, Young & Rubicam's profits belong to the people most responsible for generating those profits. This principle has guided our company since its founding, and will continue to serve us well into the future." Nevertheless, in August 1995, Y&R commenced tentative merger negotiations with True North, a publicly-traded competitor. In connection with these discussions, Y&R hired Bear Stearns & Co. (Bear Stearns) as investment bankers. Ultimately, True North and Y&R failed to come to terms, and negotiations between the two companies ended sometime between October and December 1995.
 
 
 7
 Also in the final months of 1995, Y&R, with the assistance of Bear Stearns, evaluated for the first time the possibility of becoming a publicly-traded company through an underwritten IPO. On December 14, 1995, Bear Stearns recommended to Y&R executives, including those negotiating with Castellano, that Y&R not undertake an IPO for a couple of years, until it could show a history of financial performance comparable with other publicly-traded advertising companies. Bear Stearns further advised that Y&R's financial performance might be improved by a leveraged recapitalization. Y&R management identified Forstmann, Little & Co. (Forstmann Little), a leveraged buyout firm, as a potential financial investor. Shortly thereafter, on January 17, 1996, Geogescu had an initial meeting with the CEO of Forstmann Little.
 
 
 8
 In March 1996, Forstmann Little began conducting a "due diligence" inquiry, meeting with Y&R management to learn about the company and reviewing financial and strategic information provided by Y&R. In the final week of March, Forstmann Little communicated to Y&R that it was considering a transaction that would price Y&R's equity at double its current book value. On March 31, 1996, Bear Stearns presented to Georgescu, Sheldon, Abramson and other Y&R executives an analysis of Y&R equity values potentially available in a leveraged recapitalization, advising that in such a recapitalization, Y&R shares could be worth $101.32 to $162.23 each. One Y&R executive made a note during this presentation that if there were fewer outstanding shares (as would be the case if a current equityholder, like Castellano, sold his shares to Y&R), the price per share would be greater. Forstmann Little made a formal offer (subject to completion of final due diligence) to Y&R on April 15, 1996, which would have paid double the current book value to selling equityholders. On April 21, 1996, Y&R rejected this proposal because of the low valuation offered by Forstmann Little, and authorized Bear Stearns to investigate options for Y&R with other leveraged buyout firms.
 
 
 9
 Thereafter, Bear Stearns approached Hellman & Friedman, another such firm. By June 1996, Hellman & Friedman was negotiating with Y&R regarding a possible leveraged recapitalization. On August 9, 1996, the Y&R Board approved a transaction with Hellman & Friedman in which holders of Y&R equity received $115 per share--2.4 times the book value received by Castellano at his resignation. This transaction was based on the analyses prepared by Bear Stearns in February and March 1996 in connection with the Forstmann Little negotiations.
 
 C. Proceedings in the District Court
 
 10
 Castellano brought suit against Y&R in July 1997, asserting that his decision to resign on April 1, 1996, rather than a few months later, cost him almost $7 million dollars. The complaint alleged securities fraud under federal law in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5, and fraud, breach of fiduciary duty, negligent representation, unjust enrichment and rescission under New York common law. In December 1999, the district court adopted the report and recommendation of Magistrate Judge Henry Pitman and granted Y&R's motion for summary judgment in part. The court held that Castellano had failed to show any affirmative misrepresentations on which he relied and that all but one of the facts that Castellano alleged were concealed from him in violation of § 10(b) were immaterial as a matter of law. The district court also dismissed Castellano's state law claims, except those for breach of fiduciary duty and unjust enrichment.[1] The magistrate judge had further recommended that Y&R be permitted to bring a second summary judgment motion as to the remaining securities fraud and state law claims on the theory that Castellano could not demonstrate loss causation. With the district court's permission, Y&R brought this motion. In May 2000, the court granted the motion and dismissed the remainder of Castellano's claims. This appeal followed.
 
 II. Analysis
 A. Standard of Review
 
 11
 The district court's grant of summary judgment is reviewed de novo, drawing all factual inferences in favor of the non-moving party. E.g., Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc, 192 F.3d 337, 343 (2d Cir. 1999).
 
 B. Federal Securities Claims
 
 12
 1. Sufficiency of evidence of affirmative misrepresentations
 
 
 13
 Castellano asserts that the district court erred in granting summary judgment on those federal securities claims based on Y&R's alleged affirmative misrepresentations. He points to three alleged misrepresentations:
 
 
 14
 (1) On January 22, 1996, several days after Y&R's first contact with Forstmann Little, Castellano contacted Sheldon, Vice Chairman of Y&R, regarding rumors of a potential "floatation" of Y&R's stock, and indicated that if these rumors were true, he wanted to remain with the company to protect the value of his equity. According to Castellano, Sheldon responded, "Look, Ugo, I can assure you the company is not going to go public[. T]hose rumors, as you remember, are periodical, they come from time to time[. N]othing is going to change in the near future."
 
 
 15
 (2) At Castellano's request for protection in the event of a "floatation," Sheldon agreed to offer him price protection in the event of an IPO before December 31, 1996, and partial price protection in the event of an IPO before December 31, 1997, as part of his severance agreement, despite the fact that Sheldon knew Bear Stearns had recommended that Y&R should not attempt an IPO for the next two years.
 
 
 16
 (3) As part of the resignation negotiations, Sheldon offered Castellano a higher rate of interest on the payout from his shares. According to Castellano, Sheldon indicated that the purpose of this higher interest rate was to increase the amount Castellano received so that it was equal to what he would receive if he sold half his equity at the projected 1996 book value and half at the projected 1997 book value, giving Castellano the same value whether he resigned and sold his equity in 1996 or in the following year.[2]
 
 
 17
 To recover for a fraudulent affirmative misrepresentation, Castellano must demonstrate that his reliance on the false statement caused him injury. San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996). Y&R first contends that Sheldon's assurance that "nothing is going to change in the near future" was not false, since it was made in the context of a conversation about a possible IPO and Y&R had by this time decided not to pursue an IPO in the immediate future. We conclude that Sheldon's statement, as reported by Castellano, need not be understood as so limited and that a jury question as to its falseness is thus presented. Y&R also contends that Castellano's request for price protection in the event of an IPO, made after Sheldon's assurance, precludes a finding of reliance on Sheldon's statement because it shows that Castellano recognized the possibility that Y&R might become a publicly-traded company. We disagree that the request for price protection precludes reliance as a matter of law. Although Castellano was obviously aware of some possibility that Y&R might go public, a jury is entitled to consider whether Castellano relied on Sheldon's statement to the extent that he concluded that the possibility of changes in the company's organization was slim and that the price protection he obtained was sufficient to protect him in the event that slim possibility occurred. A jury could conclude that had Castellano known that Sheldon's alleged statement was false, he would either have bargained for greater price protection, deferred his resignation, or taken both steps. Thus, we conclude that summary judgment was improperly granted as to this claim.
 
 
 18
 However, Castellano's allegation that the IPO price protection he received in his severance agreement itself amounted to an actionable misrepresentation must fail. Castellano claims that by agreeing to extend the protection, Y&R implicitly represented that an IPO was the means by which new capital was likely to come into the company. In his deposition testimony, Castellano acknowledged that he himself actively sought the price protection. Y&R's agreement to provide the protection that he requested could not be interpreted by a reasonable jury as an affirmative misrepresentation that Y&R intended to pursue an IPO, particularly when Sheldon explicitly disclaimed that Y&R had any intention to pursue an IPO when Castellano questioned him on this point. Castellano's actual objection appears to be that Y&R failed to reveal to him that it was considering other options for bringing outside capital into the company. This objection is treated below, however, in the discussion of material omissions.
 
 
 19
 Finally, the district court correctly ruled that Castellano has failed to introduce evidence demonstrating that Y&R represented that Castellano would receive the same financial benefit whether he resigned in 1996 or the next year, as a result of the higher interest rate set for the installment payments for his shares. The testimony on this point, including Castellano's, is consistent: the higher interest rate was meant only to reflect projected future increases in the book value of the shares. The value to equityholders that arose from the Hellman & Friedman transaction did not involve an increase in book value. There is simply no evidence that the misrepresentation Castellano alleges--that he would be in the same position whether he resigned in 1996 or the following year--was ever made.
 
 2. Materiality of omitted information
 
 20
 Castellano asserts that Y&R violated § 10(b) and Rule 10b-5 when it failed to make various disclosures to him as he negotiated his resignation and the sale of his equity. To succeed in a Rule 10b-5 action, a plaintiff must prove that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material misrepresentation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 534 (2d Cir. 1999) (internal quotation marks omitted). A failure to disclose material information is actionable only when the defendant had an affirmative duty to disclose these facts, In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993), but Y&R does not dispute that it was bound by such a duty. Specifically, under § 10(b) and Rule 10b-5, closed corporations that purchase their own stock have a special obligation to disclose to sellers all material information. Jordan v. Duff and Phelps, Inc., 815 F.2d 429, 434 (7th Cir. 1987). As we stated in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2d Cir. 1968) (en banc), any insider "in possession of material inside information must either disclose it to the investing public, or, if he is disabled from disclosing it in order to protect a corporate confidence, or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed." This insider's duty to disclose arises from the "relationship of trust and confidence" between corporate insiders and shareholders. Chiarella v, United States, 445 U.S. 222, 230 (1980). It logically follows that just as knowledgeable corporate insiders have a fiduciary duty to disclose material facts when entering stock deals with outsiders, so do closed corporations buying their own stock. Jordan, 815 F.2d at 435; see also McCormick v. Fund Am. Cos., 26 F.3d 869, 876 (9th Cir. 1994) (listing "[n]umerous authorities" holding that a corporate issuer in possession of material nonpublic information must disclose or refrain from trading its securities); cf. Powers v. British Vita, P.L.C., 57 F.3d 176, 188-89 (2d Cir. 1995) (finding fiduciary relationship between directors/majority shareholders and a fellow director/minority shareholder creating duty to disclose in negotiations over resignation package).
 
 
 21
 Castellano argues that Y&R unlawfully withheld material information that it was obliged to disclose when it failed to tell him of (1) Y&R's failed merger negotiations with True North; (2) Bear Stearns' recommendations to Y&R that it should postpone any IPO for at least two years and pursue a leveraged recapitalization in the interim; (3) the adjusted valuation analyses prepared by Bear Stearns in connection with the Forstmann Little discussions showing the potential value of Y&R, should a willing buyer be found; and (4) Y&R's discussions with Forstmann Little regarding a potential leveraged recapitalization. The district court, adopting the recommendation of the magistrate judge, held the first three facts to be immaterial as a matter of law, but found a question of fact as to the materiality of the Forstmann Little discussions.
 
 
 22
 For an undisclosed fact to be material, "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). Material facts include those that "affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities." Texas Gulf Sulphur Co., 401 F.2d at 849. When contingent or speculative events are at issue, the materiality of those events depends on "'a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" Basic, 485 U.S. at 238 (quoting Texas Gulf Sulphur Co., 401 F.2d at 849). The Supreme Court has expressly stated that in such circumstances no single event or factor is necessarily determinative of the materiality inquiry. Id. at 239. Summary judgment may not be granted on the ground that alleged omissions are immaterial "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).
 
 
 23
 Castellano asserts that the failed merger discussions with True North, the Bear Stearns recommendations, the Bear Stearns valuation analyses, and the Forstmann Little discussions all demonstrate that Y&R was purposefully pursuing a restructuring plan for the first time in its history with potentially major implications for the value of its stock. Castellano argues that had he been aware of these developments, he would either have bargained for broader price protections as a condition of his resignation or would have remained as CEO of Y&R Italia, as he had a contractual right to do for up to one year even if told that he would thereafter be terminated. Conversely, Y&R argues that none of the omitted information is material and that the district court erred in holding that Y&R's ultimately unfruitful discussions with Forstmann Little presented a triable question of materiality. We consider the materiality of each omission below.
 
 
 24
 a. The merger negotiations with True North
 
 
 25
 At the time Castellano entered into his severance agreement with Y&R, merger discussions with True North had been definitively broken off because of fundamental disagreement regarding pricing of Y&R and control of the merged companies. Nevertheless, in the months prior to the severance agreement, while Y&R and Castellano were actively negotiating the terms of his resignation, Y&R had hired Bear Stearns to staff the possible merger with True North. Also, at that time, the CEOs and CFOs of both Y&R and True North had met to discuss possible structures for the transaction, as well as how the companies' operations would fit together.
 
 
 26
 Castellano argues that Y&R had an ongoing duty to disclose material information to him while he was negotiating his resignation and stock resale, apparently suggesting that the appropriate question is not whether the True North negotiations were material at the time that Y&R repurchased his stock, but whether theTrue North negotiations were material at the time that they were occurring, before it became clear that the companies would not reach an agreement. We do not agree. The Seventh Circuit has stated that for purposes of § 10(b) and Rule 10b-5, the "materiality of the information misstated or withheld is determined in light of what the defendants knew at the time the plaintiff committed himself to sell the stock, in this case by signing the agreement to sell...." Michaels v. Michaels, 767 F.2d 1185, 1195 (7th Cir. 1985). This holding found support in a case from this circuit, Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 890-91 (2d Cir. 1972), in which we approved a jury instruction by Judge Milton Pollack that materiality was to be determined as of the date "when an insider has committed himself to purchase the stock." Thus, materiality must be analyzed as of April 1, 1996,[3] when Castellano resold his shares to Y&R, months after negotiations between True North and Y&R had broken off.[4]
 
 
 27
 Under the materiality test set out in Basic, the potential significance of a merger is considered in light of the likelihood that it will occur. A merger is often of tremendous significance to shareholders; indeed, a merger in which a corporation is bought out has been called "'the most important event that can occur in a... corporation's life, to wit, its death.'" Basic, 485 U.S. at 238 (quoting SEC v. Geon Indus., Inc., 531 F.2d 39, 47 (2d Cir. 1976)). While as of April 1, 1996, there was no likelihood that Y&R would merge with True North, this does not necessarily mean that there was no likelihood that Y&R would merge with anyone. Castellano argues that even after merger negotiations between True North and Y&R had permanently broken down, the previous occurrence of merger talks was material, as it signaled a new willingness on behalf of Y&R management to consider sale of the company to a third party, and thus would suggest to a reasonable investor an increased likelihood that Y&R might undertake a major restructuring, such as a merger, in the near future. See SEC v. Gaspar, Fed. Sec. L. Rep. ¶ 92,004, 1985 WL 521, at *15 (S.D.N.Y. 1985) ("[The] founder of the company... had never before considered selling his shares and was for the first time seriously responding to and negotiating with a potential purchaser. In this context, the mere fact that the meetings were taking place was alone material information."). In short, Castellano argues that on April 1, 1996, the True North negotiations were material not in themselves, but because of what they signaled regarding Y&R's interest in restructuring.
 
 
 28
 Relying on a district court opinion affirmed by summary order, Y&R responds that a bare intention to pursue an extraordinary corporate transaction, prior to any contact with potential suitors, cannot be a material fact under Rule 10b-5. See Panfil v. ACC Corp., 768 F. Supp. 54, 58(W.D.N.Y. 1991) ("The mere 'intention' to pursue a possible merger at some time in the future, without more, is simply not a material fact under rule 10b-5."), aff'd without opinion, 952 F.2d 394 (2d Cir. 1991). It is not obvious to us that the bright-line rule posited by Y&R is correct, given Basic's instruction to determine materiality by reference to the magnitude and probability of a transaction based on the particular circumstances of each individual case. However, even if Y&R accurately characterizes the law, this rule does not fully dispose of the question at hand. Here, Y&R had established contact with a potential suitor--True North--and had engaged in extensive negotiations with this suitor. In some instances, such prior contact with a potential merger partner, even if it has been fruitless, will present a jury question as to materiality, for this contact can arguably demonstrate both that a company's intention to merge or undertake other restructuring has moved beyond its incipient stages and ripened into purposeful action, and that the company has been a plausible merger candidate in the judgment of at least one potential partner.[5] See Jordan, 815 F.2d at 434 ("A jury would be free... to conclude that the board's decision of November 14 to seek a buyer for Duff & Phelps--coupled with the fact that at least one putative buyer [had] thought Duff & Phelps worth $50 million, which casts an important light on the prospect of a profitable conclusion to the search--was 'material' under the standard of TSC Industries.").
 
 
 29
 In the present case, there is no evidence that Y&R formally resolved to seek other merger partners, that its investment bankers advised it to continue to seek a merger, or indeed that it took any actions to pursue a merger after negotiations with True North broke down. On the other hand, when the True North negotiations failed, Y&R did not give up its consideration of corporate restructuring and capital infusion. Instead, as discussed below, just weeks after the failure of the True North negotiations, Y&R actively considered its strategic alternatives with the assistance of Bear Stearns, and based on Bear Stearns' recommendations, immediately initiated conversations with a leveraged buy-out firm. In this context, where Y&R's actions corroborate an ongoing intention to seek an infusion of outside capital through corporate restructuring, the failed merger negotiations with True North are not immaterial as a matter of law. A jury could find a substantial likelihood that a reasonable investor would have viewed Y&R's failed merger negotiations with True North as significantly altering the total mix of information available, given the seriousness of the negotiations and that after the failure of these negotiations, Y&R continued to explore corporate restructuring options. This conclusion is significantly bolstered by Castellano's assertion, accepted as true for purposes of a summary judgment motion, that the True North negotiations represented the first time Y&R had ever considered transferring equity to an outsider.
 
 
 30
 b. The Bear Stearns recommendations on restructuring
 
 
 31
 As noted above, Bear Stearns recommended to Y&R executives in December 1995 that Y&R should not attempt an IPO until it could offer "a couple of years" of financial results comparable with other publicly-traded advertising companies. Bear Stearns also recommended that Y&R seek a leveraged recapitalization, which led to Y&R's initiation of discussions with Forstmann Little. The district court found that these recommendations were immaterial, but Castellano asserts that Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726 (2d Cir. 1987) prevents us from finding that such advice from investment bankers is immaterial as a matter of law. In Kronfeld, this court considered whether summary judgment was properly granted to defendants when defendant TWA issued a prospectus in connection with a stock offering that described the relationship between TWA and TWC (TWA's parent company) but neither revealed that TWC had engaged Goldman Sachs to review the structural and financial alternatives available in regard to TWA nor described the alternatives under consideration. Id. at 728-29. We held that given the prospectus's partial disclosure of the relationship between TWA and TWC and the relationship's future prospects, a question of fact was presented as to the materiality of Goldman Sachs' review of various specific structural alternatives. Id. at 735-36. We did not hold that review, discussion or recommendation of strategic alternatives always presents a question of materiality for the jury. Rather, Kronfeld stands for the proposition that when a defendant makes statements that are misleading because they are incomplete, this may render material any information necessary to make the statements accurate. Id. at 729; see also In re Time Warner Inc. Sec. Litig., 9 F.3d at 268 ("[W]hen a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration.").
 
 
 32
 In the present case, it is arguable that Sheldon's statement that Y&R did not intend to pursue an IPO and that nothing was going to change in the near future, discussed in Part II.B.1, supra, amounted to such a misleading, incomplete statement rendering the Bear Stearns recommendations material. However, we need not decide either that issue or the materiality of the Bear Stearns recommendations standing alone, since prior to Castellano's resignation on April 1, 1996, Y&R actually acted on the recommendations, identifying a partner for a leveraged recapitalization and initiating discussions with that partner. Even if an investment banker's recommendations as to future business transactions may be immaterial as a matter of law when considered in isolation (a question we do not reach), such recommendations can certainly rise to the level of materiality when a company forms intentions based on them and undertakes sufficient action in pursuit of these intentions. Thus, we conclude that it is inappropriate to determine the materiality of the Bear Stearns recommendations in a vacuum, without reference to what followed, and that the materiality of the recommendations follows from the materiality of the Forstmann Little contacts, discussed below.
 
 
 33
 c. The Bear Stearns valuation analyses
 
 
 34
 The district court held that the adjusted valuation analyses prepared by Bear Stearns, which showed that under certain assumptions Y&R's shares might be worth two to three times book value, were immaterial as a matter of law. The court based its analysis on Castellano's obligation under his shareholder agreement to resell his shares to Y&R at book value. Because of this obligation, the district court reasoned, the "true value" of the shares was necessarily irrelevant to Castellano, since he had no power to bargain over the valuation of his shares. Castellano argues that this analysis overlooks the power he had to control the timing of his exit from Y&R for at least a year. Had Castellano known the "true value" of his shares, he argues, he could have refused to resign for that period in the hope that a leveraged recapitalization would realize the potential value of his shares prior to his departure. Alternatively, he could have bargained for broader price protections as part of his severance agreement.
 
 
 35
 In response, Y&R asserts that "[t]he Bear Stearns analysis would be relevant only if it were connected to a specific likely transaction, for only then could the hypothetical value be realized." However, this does not resolve the materiality of the Bear Stearns valuation analyses, since Castellano asserts that they were indeed connected to a specific likely transaction, namely, the possible Forstmann Little buyout. Thus, the materiality of the valuation analyses depends upon the materiality of the Forstmann Little discussions. If these discussions were material, the valuation analyses prepared in connection with them added information meaningful to a reasonable investor regarding the potential financial significance of a Forstmann Little buyout. If the discussions did not rise to the level of materiality, the analyses did not have a sufficiently close connection to a potential transaction to have reasonably affected an investor standing in Castellano's shoes.
 
 
 36
 d. The Forstmann Little discussions
 
 
 37
 The district court, adopting the recommendation of the magistrate judge, held that Y&R's discussions with Forstmann Little were sufficiently advanced by April 1, 1996, for a jury to find them material. Y&R claims that the district court erred in this respect. It argues that as of April 1, Y&R and Forstmann Little had not reached agreement on the appropriate parameters for valuing Y&R and that Forstmann Little had not yet made any proposals regarding the price and structure of a potential offer. Y&R also points to testimony by its Vice Chairman that as of April 1, 1996, Bear Stearns and Y&R believed that the likelihood of any kind of transaction with Forstmann Little was remote, due to the disagreements on valuing Y&R. Thus, Y&R argues, the potential transaction with Forstmann Little was too inchoate and unlikely to be material on April 1.
 
 
 38
 Castellano responds that during early 1996, Y&R and Forstmann Little had entered into a confidentiality agreement and engaged in extensive due diligence, with the assistance of outside accountants and law firms engaged specifically for that purpose. He points to the valuation analyses prepared to enhance the value of Y&R in Forstmann Little's eyes, as well as to Y&R executives' daily meetings on the subject of the possible Forstmann Little transaction from January or February of 1996 until negotiations were abandoned in mid-April. Castellano notes evidence that in late March, Forstmann Little had indicated that it was considering making an offer for Y&R equity at double its current book value. Castellano also asserts that Y&R's claim that any deal with Forstmann Little was unlikely on April 1 is undermined by the April 10 meeting in which executives of Y&R, including Georgescu and Sheldon, flew to Los Angeles to discuss the Forstmann Little offer for seven hours, and by Forstmann Little's submission of a formal proposal on April 15.
 
 
 39
 As noted above, in Basic, the Supreme Court held that when contingent or speculative events are at issue, the materiality of those events depends on "the probability that the [event] will be consummated, and its significance to the issuer of the securities." Basic, 485 U.S. at 250. "The mere fact that a company has received an acquisition overture or that some discussion has occurred will not necessarily be material." Glazer v. Formica Corp., 964 F.2d 149, 155 (2d Cir. 1992). To determine materiality, we must examine "indicia of interest in the transaction at the highest corporate levels." Basic, 485 U.S. at 239. Illustrative examples of such indicia include "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries." Id. In this case, the possible transaction with Forstmann Little was far from a certainty on April 1, 1996, and indeed ultimately did not come to pass. Nevertheless, just as the eventual success of a transaction does not automatically render the earlier discussions or intentions regarding that transaction material, neither should the ultimate failure of a transaction to come to fruition render all discussion or negotiations regarding that transaction immaterial. "'The probability of a transaction occurring must be considered in light of the facts as they then existed [at the time of the securities purchase], not with the hindsight knowledge that the transaction was or was not completed.'" Panfil, 768 F. Supp. at 58-59 (quoting In re Gen. Motors Class E Stock Buyout Sec. Litig., 694 F. Supp. 1119, 1127 (D. Del. 1988)).
 
 
 40
 In the present case, the level of serious interest and engagement displayed by Y&R and Forstmann Little during these discussions presents a question of fact regarding materiality that precludes summary judgment. Even if, as Y&R asserts, a transaction with Forstmann Little was unlikely as of April 1, there is no requirement that a transaction need be probable for negotiations and preparations regarding this transaction to be material. As materiality in such a circumstance is determined by considering both the probability of an event and its potential magnitude, a relatively improbable event of sufficient magnitude could potentially be material, since a factfinder might find it likely to have been viewed by a reasonable investor as significantly altering the total mix of information available. See SEC v. Shapiro, 494 F.2d 1301, 1306-07 (2d Cir. 1974) ("Although the negotiations had not jelled to the point where a merger was probable, the possibility was not so remote that, when considered in the light of a projected share increase of at least 600% in Harvey's earnings per share, it might not have influenced a reasonable investor."), cited approvingly in Basic, 485 U.S. at 240 n.19. Here, as noted above, the valuation analyses and the proposal that Forstmann Little had indicated it was contemplating offering as of late March 1996 demonstrate that the potential transaction could have been of considerable magnitude for Y&R shareholders, potentially leading to the doubling or tripling of the value of their holdings. Given this circumstance, and given the Y&R executives' intense attention to the Forstmann Little prospect, Y&R's engagement of law firms and investment bankers, and the parties' entrance into a confidentiality agreement and extensive due diligence, the district court appropriately refused to hold the Forstmann Little discussions immaterial as a matter of law. See Glazer,964 F.2d at 156 (holding that district court had inappropriately found leveraged buyout negotiations immaterial as a matter of law when the parties had engaged in substantive meetings regarding the possibility of a leveraged buyout and had begun due diligence).
 
 
 41
 As a result of this conclusion, for the reasons set out above we find a question is also presented for the factfinder regarding the materiality of the Bear Stearns recommendations and the materiality of the valuation analyses prepared by Bear Stearns in connection with the Forstmann Little discussions. Accordingly, we now consider whether any of these omissions could be found to have caused Castellano's loss.
 
 3. Loss causation
 
 42
 Y&R's first motion for summary judgment did not allege that Castellano had failed to demonstrate loss causation as to the alleged material omissions. Nevertheless, as noted above, the magistrate judge not only recommended that summary judgment be granted in part and denied in part, but also recommended sua sponte that Y&R be permitted to file a second motion for summary judgment under this theory. The district court adopted this recommendation, and granted Y&R's second summary judgment motion, dismissing all remaining claims and holding that a jury could not find loss causation on the basis of the facts alleged.
 
 
 43
 Y&R, echoing the holding of the district court, argues that even if the omitted information is material, Y&R's failure to disclose this information to Castellano is not actionable under § 10(b) and Rule 10b-5, because Castellano has failed to show loss causation. "It is settled that causation under federal securities laws is two-pronged: a plaintiff must allege both transaction causation, i.e., that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, i.e., that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Suez Equity Investors v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001). While transaction causation is generally understood as reliance, loss causation has often been described as proximate cause, meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission. Id. at 96. "The loss causation inquiry typically examines how directly the subject of the [omission] caused the loss, and whether the resulting loss was a foreseeable outcome of the [omission]," while also taking into account issues such as the presence of intervening causes and the lapse of time between the behavior complained of and the loss. Id.; see also First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769-70 (2d Cir. 1994). This determination may often rest in part on legal policy considerations. Id. at 769. The loss causation requirement is intended to "fix a legal limit on a person's responsibility, even for wrongful acts." Id.
 
 
 44
 In the securities fraud context, transaction causation is presumed when a claim rests on a material omission. Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54 (1972); Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 967 F.2d 742, 747-48 (2d Cir. 1992). But Y&R argues, and the district court held, that Castellano is unable to demonstrate loss causation as to any of the material omissions discussed in Part II.B.2 above because Hellman & Friedman's recapitalization was an intervening independent event that caused the increase in value to Y&R stockholders and Castellano's economic loss. Under this theory, Y&R's rejection of the Forstmann Little offer in April 1996 mooted Y&R's failure to disclose those discussions, the Bear Stearns recommendations and valuations made in connection with these discussions, and the True North negotiations immediately preceding these discussions, because omission of these facts could only have proximately caused loss flowing directly from a Forstmann Little transaction.
 
 
 45
 While loss causation is easily defined, its application to particular facts has often been challenging. See, e.g., AUSA Life Ins. Co. v. Ernst and Young, 206 F.3d 202 (2d Cir. 2000) (yielding three separate loss causation analyses and conclusions). This court's most recent consideration of the issue in Suez Equity Investors attempts to reconcile arguably inconsistent threads in our prior case law, see 250 F.3d at 98 n.1, and sheds significant light on the instant appeal. In that case, we considered a § 10(b) and Rule 10b-5 claim arising from defendants' invitation to plaintiffs to invest in a healthcare financing venture called SAM Group. In pitching this investment to the plaintiffs, defendants omitted negative information regarding SAM Group's principal, J. Christopher Mallick, and his past business difficulties. SAM Group had severe liquidity problems, which plaintiffs attributed to Mallick's mismanagement, and collapsed soon after plaintiffs' investment. The district court dismissed plaintiffs' complaint based on a failure to allege loss causation. We reversed, finding that "[a] liberal reading of the complaint reveals allegations that the misrepresentations [regarding Mallick's background] led plaintiffs to appraise the value of SAM Group securities incorrectly by assuming the competency of Mallick, the Group's principal." Id. at 96. This, we held, was sufficient to plead loss causation, since the failure to disclose Mallick's financial and business problems could have directly affected the plaintiffs' evaluation of their investment and since Mallick's history could have made foreseeable his failure to manage the SAM Group effectively. Id. at 98.
 
 
 46
 This conclusion was supported by our earlier holding in Marbury Management, Inc. v. Kohn, 629 F.2d 705 (2d Cir. 1980). In that case, we affirmed a trial court's finding of loss causation when a trainee at a brokerage firm falsely represented that he was a stockbroker and persuaded plaintiffs to invest in various securities that thereafter lost money. While the loss in value came as a result of external market forces and not because of the trainee's lack of credentials, we held that loss causation was shown, since the trainee's misrepresentation as to his expertise induced plaintiffs both to purchase the securities and to continue to hold them when they began to lose value. Id. at 708-10. The rule affirmed in Suez Equity Investors, based on Marbury Management and later cases distinguishing it, is that "plaintiffs may allege transaction and loss causation by averring both that they would not have entered the transaction but for the misrepresentations and that the defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of the transaction." Suez Equity Investors, 250 F.3d at 97-98.
 
 
 47
 Applying this rule, we find that Castellano has identified sufficient evidence of loss causation to avoid summary judgment on his material omission claims. While Castellano was obligated to resell his shares to Y&R at book value when he left Y&R's employment, he was not obligated to leave Y&R's employment on April 1, 1996. Indeed, his status as a preferred shareholder meant that Y&R could not dismiss him without one year's notice, meaning that he was free to remain an employee of Y&R until at least April 1, 1997, and likely longer, and thus would have been free to retain his shares and benefit from any restructuring that might occur during this period. "The decision to resign or retire is as much an investment decision under these circumstances as a decision to buy or sell public stock." Smith v. Duff and Phelps, 891 F.2d 1567, 1574 (11th Cir. 1990). Because Castellano was unaware of Y&R's serious consideration of a recapitalization or the value that such a recapitalization could unlock for shareholders, a jury could find that he lacked information crucial to understanding the true "investment quality" of his Y&R shares when he made the investment decision to resign and sell his shares. See Powers, 57 F.3d at 190 (finding loss causation sufficiently alleged when acquiring corporation did not disclose to resigning CEO a recapitalization plan that would greatly dilute the value of stock options issued to CEO as part of resignation package); Mfrs. Hanover Trust v. Drysdale Sec. Corp., 801 F.2d 13, 22 (2d Cir. 1986) (finding loss causation when misrepresentation went to the "investment quality" of the securities).
 
 
 48
 The fact that Y&R's recapitalization transaction was ultimately carried out with Hellman & Friedman, rather than Forstmann Little, is not dispositive on the issue of loss causation. The opinions of Judge Oakes and then-Chief Judge Winter in AUSA Life Insurance are instructive here.[6] Judge Oakes wrote that the appropriate test for loss causation is whether "'there was a reasonable probability that the fraud actually accomplished the result it was intended to bring about.'" 206 F.3d at 212 (quoting Continental Ins. Co. v. Mercadante, 225 N.Y.S. 488, 494 (N.Y. App. Div. 1927)). We understand Judge Winter's loss causation analysis to give valuable content to Judge Oakes' "reasonable probability" test; he urged that loss causation requires
 
 
 49
 consideration of the significance to a reasonable investor of the truth compared to the content of the misrepresentations or omissions. If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss.[7]
 
 
 50
 Id. at 235. A jury could find Castellano was misled as to the potential value of his Y&R shares by Y&R's silence regarding the failed True North negotiations, as this silence misled Castellano as to the "zone of risk" that Y&R might soon enter into a major corporate transaction. Similarly, a jury could find that because Y&R failed to disclose the Bear Stearns recommendations, the valuation analyses, and the Forstmann Little discussions to him, Castellano was unable to value his shares accurately; it could then find that this proximately caused his loss, since it caused him to discount inappropriately the "zone of risk" that Y&R would soon undertake a leveraged recapitalization that would result in significant value to shareholders. A jury could find that Y&R's fairly serious consideration of a transaction so potentially lucrative for Castellano would cause a reasonable investor in his shoes to revise his notions of the potential value of his shares in the short term, taking into account not only the possibility that the deal with Forstmann Little would go through but also the probability that if it did not, Y&R might seek such a transaction with another party.
 
 
 51
 In Jordan, the Seventh Circuit considered the "sticky problem" of causation in somewhat similar circumstances. 815 F.2d at 441. There an employee resigned and sold back his shares to a closely-held corporation, unaware that the board had resolved to sell the firm and was discussing a merger with a potential partner. Shortly after his resignation, the corporation announced a merger that ultimately fell through; while the corporation was not successful in finding another merger partner, it did thereafter form an Employee Stock Ownership Trust, which acquired the corporation, resulting in benefits to shareholders. The Seventh Circuit concluded that "[b]ecause a reasonable investor would not conclude that the withdrawal of one bid implies that there will be no others... a jury would be entitled to conclude that Jordan would have stuck around [until the Trust acquired the firm]." 815 F.2d at 441. As the Seventh Circuit explained, the rationale of finding a securities violation in such a circumstance is that the employee "sold his stock in ignorance of facts that would have established a higher value.... If one deal for $50 million falls through, another may be possible at a similar price. Investors will either hold the stock or demand a price that reflects the value of that information." Id. at 440. In short, a factfinder could conclude that when Y&R attempted to undertake a recapitalization that would yield significant value, it was foreseeable that it would continue to attempt such a recapitalization with other partners if the first attempt was not fruitful.[8] A jury could find that by failing to disclose material information about such restructuring and recapitalization efforts, Y&R disguised the very risk to which Castellano fell victim: that a recapitalization would soon occur that could double or triple the worth of his shares.
 
 
 52
 Nor is this conclusion inconsistent with our prior statement that "when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions." Gelt Funding, 27 F.3d at 769. The cases where we have held that intervening direct causes preclude a finding of loss causation present facts sharply different from those at issue here. See Powers, 57 F.3d at 189 (market value of stock fell as a result of recession); Gelt Funding, 27 F.3d at 772 (investor's loss caused by marketwide real estate crash); Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992) (loss to plaintiff from loans made on the basis of fraudulent misrepresentation were the result of a decline in value of collateral unrelated to the fraud); Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62 (2d Cir. 1985) (loss caused not by misrepresentations in various documents used to attract investments but by looting and mismanagement of these funds by controlling stockholders). Here, Y&R failed to disclose the recommendations made and analyses and discussions undertaken in preparation for the same sort of transaction that Y&R eventually successfully completed. The undisclosed failed merger negotiations present a closer question, but here too, Y&R's ongoing efforts to increase the value of its shares through corporate restructuring provide the necessary continuity. In short, a jury could find that foreseeability links the omitted information and the ultimate injury in this case, in contrast to cases where external and unforeseeable factors such as market crashes were the direct cause of a plaintiff's loss. Thus, we find that summary judgment was improperly granted on Castellano's § 10(b) and Rule 10b-5 claims regarding Y&R's failure to disclose the failed True North negotiations, the Bear Stearns recommendations, the Bear Stearns valuation analyses, and the Forstmann Little discussions.
 
 C. State Law Claims
 1. Breach of fiduciary duty
 
 53
 Castellano appeals the district court's dismissal of his claim under New York state law for breach of fiduciary duty. This claim is barred by the Martin Act, New York's blue sky law, which prohibits various fraudulent and deceitful practices in the distribution, exchange, sale and purchase of securities. N.Y. Gen. Bus. Law art. 23-A. The New York Court of Appeals has held that there is no implied private right of action under the Martin Act, CPC Int'l Inc. v. McKesson Corp., 70 N.Y.2d 268, 275 (1987), and other New York courts have determined that sustaining a cause of action for breach of fiduciary duty in the context of securities fraud "would effectively permit a private action under the Martin Act, which would be inconsistent with the Attorney-General's exclusive enforcement powers thereunder." Eagle Tenants Corp. v. Fishbein, 582 N.Y.S.2d 218, 219 (N.Y. App. Div. 1992) (internal citation omitted); see also Horn v. 440 East 57th Co., 547 N.Y.S.2d 1, 5 (N.Y. App. Div. 1989).
 
 
 54
 Castellano argues that the common law cannot be abrogated by implication and that the New York Court of Appeals, in contrast to the New York Appellate Division, has never explicitly considered whether the Martin Act has preempted common law claims involving securities. However, principles of federalism and respect for state courts' interpretation of their own laws counsel against ignoring the rulings of those New York courts that have taken up the issue. As a result, we find that Castellano's breach of fiduciary duty claim was properly dismissed.[9]
 
 2. Unjust enrichment
 
 55
 The district court dismissed Castellano's unjust enrichment claim finding that it, like his federal securities claims, was doomed by his inability to show loss causation. For the reasons given above, we find that Castellano has identified sufficient evidence to allow the question of loss causation to be submitted to a jury, and as a result we find that Castellano's unjust enrichment claim was improperly dismissed.
 
 III. Conclusion
 
 56
 For the reasons stated above, we affirm the district court's grant of summary judgment as to Castellano's state law claim of breach of fiduciary duty and as to Castellano's § 10(b) securities fraud claims except for that based on Sheldon's statement that "nothing was going to change in the near future" and those based on Y&R's failure to disclose information regarding the failed True North negotiations, the Bear Stearns recommendations, the valuations analyses prepared in connection with the Forstmann Little discussions and the discussions with Forstmann Little. We reverse the district court's grant of summary judgment as to these claims and as to Castellano's state law unjust enrichment claim. We remand to the district court for proceedings not inconsistent with this opinion.
 
 
 
 NOTES:
 
 
 [1]
 Neither the magistrate judge's report and recommendation, nor the district court's order adopting the recommendation, specifically addressed Castellano's New York state fraud and rescission claims, but they were necessarily dismissed by the district court's summary judgment orders. Castellano does not raise these claims on appeal, and we do not address them.
 
 
 [2]
 Castellano actually asserts that he was told that the higher interest rate ensured that he would receive the same amount of money whether he resigned in 1996 or 1998. It is unclear to us why 1998, rather than 1997, is the relevant year, given that all parties agree that the higher interest rate was meant to reflect the projected 1997 book value increase, but given our disposition of the claim, nothing turns on this distinction.
 
 
 [3]
 The district court held that April 1, 1996, was the appropriate date for assessing materiality because it was the date at which, viewing the evidence in the light most favorable to Castellano, the parties became legally committed to the transaction. On appeal, neither Y&R nor Castellano asserts that Castellano's commitment to sell his stock preceded April 1, 1996.
 
 
 [4]
 This distinction is perhaps more logically explained in terms of a duty to disclose rather than materiality, in that Y&R had a duty to disclose all material information to Castellano prior to consummation of the sale, rather than an ongoing duty during negotiations. See generally Chiarella, 445 U.S. at 228 ("[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so.").
 
 
 [5]
 Of course, for prior failed merger negotiations to present a question of materiality, the negotiations must at the very least have advanced to the point that they would not have been considered immaterial as a matter of law at the time they were occurring. The True North negotiations had so advanced. See, e.g., McCormick, 26 F.3d at 883 (finding that where there had been no board resolutions as to sale of company, but the principals had begun to negotiate and an investment banker had been authorized to discuss the sale, there was at the very least a question of materiality).
 
 
 [6]
 The panel in AUSA Life Insurance produced three separate analyses on the question of loss causation that led to three separate conclusions: Judge Oakes, writing for the court, concluded that the issue should be remanded to the district court for further factfinding; Judge Jacobs believed that the district court's finding of an absence of loss causation should be affirmed and set out his rationale, but agreed to concur in the mandate to remand for further factfinding since a vote to affirm "would cause the appeal to misfire and leave the case undecided--an unacceptable outcome in a reviewing court"; Judge Winter dissented, voting to reverse the district court's finding of no loss causation. 206 F.3d at 224-25, 228.
 
 
 [7]
 Judge Winter based his analysis in part on the purpose of § 10(b) and Rule 10b-5: "Those laws, as pertinent to the instant matter, impose a duty on firms to provide investors with truthful information relevant to the value of certain investments." AUSA Life Ins., 206 F.3d at 234.
 
 
 [8]
 The various loss causation opinions in AUSA Life Insurance disagreed on whether foreseeability was properly judged from the standpoint of a reasonable investor or a reasonable defendant. 206 F.3d at 217, 234-35. At least in the present case, we see no difference in result between these formulations.
 
 
 [9]
 The district court also dismissed Castellano's negligent misrepresentation claim based on the theory that there was no private right of action for claims covered under the Martin Act. Castellano does not address this claim on appeal, and so we do not reach it.