A. John **GERRARD,** Individually and as successor trustee under the Roberta F. Gerrard Trust; Linda G. Ely; Morgan L. Ely; and Heather L. Ely, Plaintiffs,

v.

A.J. **GERRARD & COMPANY;** Anthony Tako; Richard J., Augustine; L.E. Burns; C. James Ehlert, Jr.; Richard Louis; Donald M., McMahon; Helen Mcmahon; Richard Neville; Morrie, Peterson; Renato J. Turano; Michelle Wolf; Jordan Wolf; Robert J. Zuponeck; And Neobliviscaris Partnership, Defendants.

No. CV 101–067.

United States District Court, S.D. Georgia, Augusta Division.

Sept. 30, 2003.

Thomas W. Tucker, Tucker, Everitt, Long, Brewton & Lanier, PC, Augusta, GA, John B. Bridge, George M. Plews, Amy E. Romig, Jeffrey A. Townsend, Plews, Shadley, Racher & Braun, Indianapolis, IN, for Plaintiffs.

Patrick J. Rice, Hull, Towill, Norman, Barrett & Salley, PC, Augusta, GA, Timothy H. Kratz, Jefferson M. Allen, McGuire Woods, LLP, Atlanta, GA, for Defendants.

## ORDER

BOWEN, Chief Judge.

Presently before the Court are cross motions for summary judgment. Defendants have filed a motion for summary judgment on all counts (Doc. No. 97), and

Plaintiffs have filed a motion for partial summary judgment on Count I (Doc. No. 110). For reasons stated more fully below, both Plaintiffs' motion and Defendants' motion are **DENIED.**

## I. *BACKGROUND*

### A. Procedural History

This case was removed from the Superior Court of Richmond County on April 30, 2001. The complaint alleges violations of various federal and state laws in ten counts: (1) **Count I:** Violation of 15 U.S.C. § 78j(b) and SEC Rule 10b–5; (2) **Count II:** Violation of State Securities Law (the Georgia Securities Act of 1973 & O.C.G.A. § 10–5–12(a)(2)); (3) **Count III:** Violation of the Georgia RICO Statute (O.C.G.A. § 16–14–4); (4) **Count IV:** Common Law Fraud; (5) **Count V:** Negligent Misrepresentation (Common Law); (6) **Count VI:** Breach of Fiduciary Duties; (7) **Count VII:** Rescission; (8) **Count VIII:** Statutory Fraud and Deceit by Omission (O.C.G.A. § 23–2–53); (9) **Count IX:** Statutory Fraud and Deceit–Actual and Constructive (O.C.G.A. §§ 23–2–51, 23–2–52); and (10) **Count X:** Breach of Contract. Of the original ten (10) counts, two were dismissed in an Order issued July 15, 2002. (Doc. No. 80.) In that Order, the Court dismissed **Count VI** and **Count X.** (Doc. No. 80 at 12, 16.) The Court dismissed **Count VI** for failure to state a claim and granted summary judgment in regard to

Count X. (*Id.*) Defendants have moved for summary judgment on the eight remaining counts (**Counts 1–5, 7–9**) while Plaintiffs have moved for summary judgment on **Count I.**

### B. Material Facts

1. *Background of A.J. Gerrard & Company and Distribution of Company Shares to Plaintiffs*

Distilled to its essence, this case is about the events leading to the sale of some family-owned stock in the A.J. Gerrard & Company ("the Company") in 1999. The Company was founded in 1938 as a metal strapping business by A. John Gerrard.[1] (Doc. No. 112 ¶ 1; Complaint ¶ 11.) Shares in the Company were owned both directly and under the Roberta F. Gerrard Trust by various members of the Gerrard Family.[2] (Doc. No. 112 ¶ 2.) John Gerrard and Linda Ely's parents gave them shares in the company at about the time they turned 21 years old (Doc. No. 146 ¶ 1), while other shares were transferred to them through the estate of Jack Gerrard, their father, and through the Roberta F. Gerrard Trust. (Doc. No. 125 ¶ 1).

When Jack Gerrard died on May 7, 1997 (Doc. No. 100 ¶ 2), he still owned a considerable number of shares in the Company. As a result, the co-trustees of his estate, David Sterling and The Northern Trust Company, hired Comstock Valuation Ad-

---

1. The parties dispute who founded the company. Defendants claim that A. John Gerrard, the father of Jack Gerrard, founded the company (Doc. No. 125 ¶ 1) while Plaintiffs assert that Jack Gerrard founded it (Doc. No. 112 ¶ 1).

2. Plaintiffs in this case are John Gerrard, who is a trustee and beneficiary of the Roberta F. Gerrard Trust, Linda Ely, who is a beneficiary of the Roberta F. Gerrard Trust, and Morgan and Heather Ely, who are the children of Linda Ely. (Doc. No. 112 ¶ 2.) At the time of Jack Gerrard's death, Defendant Tako was the

Company's Chairman of the Board, and CEO of the company, as well as its largest shareholder with ownership of 51% of the shares. (Doc. No. 112 ¶ 4.) Defendants Augustine, Burns, Elhert, Jr. ("Elhert"), and Turano were directors on the Company's Board of Directors. (Doc. No. 112 ¶ 5.) Defendants McMahon, Peterson, and Wolf were officers of the company. (Doc. No. 112 ¶ 6.) In addition, Defendant Louis was the Company Director of Finance, Defendant Zuponeck was the Director of Sales Administration, and Defendant Neville was a legal consultant. (Doc. No. 112 ¶ 7.)

visors, Inc. ("Comstock") on August 15, 1997 to provide a valuation of the shares for estate tax purposes. (*Id.* ¶¶ 2, 36.) On November 10, 1997, Comstock issued its valuation at $54.30 per share as of the date of May 9, 1997. (*Id.* ¶ 37.) In valuing the shares, Comstock applied a discount based on the lack of market for the shares (40%) and lack of controlling interest owned by Jack Gerrard's estate (26%). (*Id.* ¶ 38.) Defendants maintain that the valuation expert applied industry-standard discounts. (Doc. No. 125 ¶ 17.)

Plaintiffs explain that Comstock advised Northern Trust, however, that "ignoring the discounts taken for a minority interest in the company and the lack of meaningful market for these shares, a value of $110.00 per share may be inferred." (Doc. No. 146 ¶ 37 (internal quotation marks omitted).) Plaintiffs further claim that they were told the goal of Comstock's valuation was to arrive at a low value to minimize taxes (Doc. No. 146 ¶ 2) and that the valuation was for estate tax purposes only (Doc. No. 146 ¶ 37). Finally, Plaintiffs maintain that John Gerrard was told that the Company would charge him an extra $5,000 to prepare a valuation for the sale of the stock as opposed to a valuation for estate tax purposes (Doc. No. 146 ¶ 2); no other valuation report was produced (Doc. No. 146 ¶ 2). The shares of the company were eventually distributed to Plaintiffs on January 7, 1998. (Doc. No. 146 ¶ 3.)

2. *Company Interest in the Family–Owned Shares*

In late 1997, the Company and The Northern Trust were in communication[3] regarding the Company's interest in repurchasing the Gerrard-family owned shares. (Doc. No. 112 ¶ 18.) Plaintiffs claim that on October 17, 1997, approximately five (5) months after Jack Gerrard's death, Mr. Clifford of Northern Trust wrote Defendant Tako allegedly noting that recent stock purchases by the Company had been at discounts and asking him what price the Company would be willing to pay. (Doc. No. 112 ¶ 18.) Tako did not respond to Clifford's letter, but the Company's Chief Financial Officer, Jordan Wolf ("Wolf"), did. (Doc. No. 112 ¶ 19.) Wolf allegedly told Clifford in October 1997 that there was no pending sale expected for the Company before the Company made an offer to buy the family shares on November 21, 1997. (Doc. No. 112 ¶¶ 19, 20.) John Gerrard refused, however, to accept the Company's November 21 offer. (Doc. No. 112 ¶ 21.)

Following the distribution of shares from Jack Gerrard's estate on January 7, 1998, Defendants claim that John Gerrard requested on February 23 that a notice be sent to all shareholders of the company offering Plaintiffs' shares for sale at $75.00 per share. (Doc. No. 100 ¶ 4.) Plaintiffs' version of this event is somewhat different. Plaintiffs claim that John Gerrard followed Defendant Tako's instruction of January 1998 to call the Company's attorney, Thomas Palmer ("Palmer"), after John advised that he wanted to send out a "feeler" to discover if there was any interest in purchasing Gerrard-family shares. (Doc. No. 146 ¶ 4.) Palmer sent out a letter in February or March 1998[4] informing shareholders that the shares were available for $75.00 per share, but John Gerrard did not receive a response. (Doc. No. 112 ¶ 28.)

---

**3.** The parties disagree on who initiated contact.

**4.** The parties disagree on the exact month the letter was sent. Defendants claim the letter was sent on March 11, 1998 (Doc. No. 100 ¶ 46) while Plaintiffs maintain the letter was sent in February 1998 (Doc. No. 112 ¶ 27).

### 3. John Gerrard's Board Membership

Plaintiffs claim that during 1998, John Gerrard told Defendant Tako that he wanted to join the Board of Directors (Doc. No. 112 ¶ 30); Defendants deny this assertion (Doc. No. 125 ¶ 30). However, the parties agree that on June 5, 1998, Tako wrote a letter to John Gerrard stating that he was delighted to have him on the Board of Directors. (Doc. No. 112 ¶ 31.) Tako sent a copy of the June 5 letter to the Board of Directors and informed it that John Gerrard would be made a "Director Emeritus." (Doc. No. 112 ¶ 32.) Defendants claim that Tako readily agreed to make John Gerrard a "full" Board member, but he realized that he could not slate him to be one until June 1999 due to prior commitments to other Board nominees. (Doc. No. 125 ¶ 32.)

John Gerrard attended his first Board meeting on June 25, 1998 believing that he was a full director rather than an honorary director. (Doc. No. 112 ¶ 33.) At the June 25 meeting, a report of the options for selling shares was distributed. (Doc. No. 112 ¶ 36.) Defendants claim that the June 1998 meeting also included information on the prospects for fiscal year 1999 as well as current developments and future plans for the various divisions of the Company. (Doc. No. 100 ¶ 28.) At the same meeting, the Board discussed the three divisions of the Company: (1) the strip division; (2) the strap division, and (3) the Papco insulation division. Plaintiffs assert that at no time during this meeting was there any discussion of the sale of any of these divisions.[5] (Doc. No. 112 ¶ 37.) Plaintiffs further assert that John Gerrard was told at the June 25 meeting that no dividends would be paid for several years (Doc. No. 112 ¶ 38), but Defendants contend that the statement made at the meeting was actually that no dividends would be paid for the *current* year due to bank covenants. (Doc. No. 125 ¶ 38.)

Also at the June 25 meeting, John Gerrard received a thick book containing company information and other materials, including recent financial statements, the Company's by-laws, and a shareholder list. (Doc. No. 112 ¶ 39; Doc. No. 100 ¶ 26.) Plaintiffs claim that John Gerrard had been trying to obtain a shareholder list prior to June 25, apparently without success. (Doc. No. 112 ¶ 39.) Defendants deny this assertion and claim, in fact, that John Gerrard could have obtained a copy of any of the information in the book upon request; however, Defendants claim he made no such request. (Doc. No. 125 ¶ 39.) The book itself was not allowed to leave the Company premises. (Doc. No. 125 ¶ 39.)

The next Board meeting that John Gerrard attended was held on September 24, 1998. Wolf reported at this meeting that Company sales, gross profit and earnings were ahead of the previous year's levels. (Doc. No. 112 ¶ 42.) During this meeting, Tako stated that he did not believe that the second half of the fiscal year would be as strong as the first half. (Doc. No. 112 ¶ 43.) Defendants claim that the September 1998 Board meeting also included a discussion of the Company's financial performance for the first five months of the then-current fiscal year, potential Company acquisitions, year 2000 computer preparations, banking and interest rate issues, and director compensation. (Doc. No. 100 ¶ 28.)

### 4. Sale of the Family–Owned Shares

Plaintiffs claim that after the June 25 Board meeting, John Gerrard received a phone call from Rich Augustine, who ex-

---

**5.** Defendants claim that Tako did tell John Gerrard sometime in 1998 that the strip divi- sion was being considered for sale by the Company. (Doc. No. 125 ¶ 37.)

pressed an interest in purchasing the family shares. (Doc. No. 112 ¶ 40.) Defendants deny this phone conversation ever occurred. (Doc. No. 125 ¶ 40.) Plaintiffs state that on September 23, 1998, the day before the September 24, 1998 Board meeting, Rich Augustine and Lew Burns, both Board members, met with John Gerrard to discuss their interest in purchasing the family-owned shares. (Doc. No. 112 ¶ 41.) At dinner on September 23, Plaintiffs allege that Augustine and Burns failed to tell John Gerrard that they, together with Tako and Wolf, had undertaken to meet with an investment banker to sell one of the Company's three divisions, the strip division. (Doc. No. 112 ¶ 48.) Defendants argue that John Gerrard knew that the Company was considering a sale of its strip division and that at the time of the September 23 dinner a decision on whether to initiate the sale of the strip division had not been made (Doc. No. 125 ¶ 48).

Plaintiffs allege that John Gerrard decided to sell the family shares after (1) attending the June 1998 and September 1998 Board meetings and (2) his dinners with Tako, Burns and Augustine.[6] (Doc. No. 112 ¶ 45). In October 1998, Augustine was negotiating with John Gerrard for the purchase of all the family shares. According to Plaintiffs, Augustine prepared, and had Palmer review, a letter that was sent to John Gerrard on October 13, 1998. (Doc. No. 112 ¶¶ 64 & 65.)

Plaintiffs state that the October 13, 1998 letter from Augustine to John Gerrard offered $67.50 per share or $2.3 million. (Doc. No. 112 ¶ 76.) On October 26, 1998, John Gerrard responded to Augustine's letter by making a counter-offer to sell for approximately $75.00 per share. (Doc. No.

112 ¶ 77.) Again, Augustine sent a letter to John Gerrard on November 6, 1998 offering to pay $70.50 per share (Doc. No. 112 ¶ 78),[7] which prompted a November 6 reply from John Gerrard offering to sell for $71.50 per share. (Doc. No. 112 ¶ 81.) Augustine accepted the November 16 proposal on December 2, 1998. (Doc. No. 112 ¶ 82.)

Augustine apparently understood that Plaintiffs wanted to sell all of their stock rather than just a portion of it. (Doc. No. 100 ¶ 53.) A total of 35,075 shares were available for purchase. Each person interested in buying Plaintiffs' stock determined the amount of shares that he would purchase. (Doc. No. 100 ¶ 54.) However, the individual purchasers committed to purchase only 25,100 of the shares, thus necessitating the Company's purchase by loan of the remaining 9,975 shares on the same terms as the other shares. (Doc. No. 100 ¶¶ 55, 57.) Two members of the Board of Directors, Mark Atcheson and Bruce McFee, did not buy any available shares. (Doc. No. 100 ¶ 56.) The $71.50 per-share price resulted in the sale of the family's 22% interest for $2,525,862.50. (Doc. No. 112 ¶ 83.) The family was paid part of its money down, with the balance to be paid over time. (Doc. No. 112 ¶ 90.)

### 5. Sale of the Strip Division

Intimately intertwined with Plaintiffs' claims is the unsuccessful attempt by the Company to sell its strip division. According to Defendants, the Company made a decision as early as June 1997 to sell its strip division (Doc. No. 100 ¶ 134), and as a result the Company asked a specialist, Lincoln Partners, to assess the value and

---

**6.** Defendants deny this assertion. (Doc. No. 125 ¶ 45.)

**7.** Defendants have objected to each of paragraphs 76, 77, 78, and 81 in Plaintiffs' State-

ment of Facts on the grounds that they "omit[ ] material terms" that were contained in the letters. (Doc. No. 125 ¶¶ 76–78, 81.) Defendants do not, however, dispute the dollar figures given in those letters.

marketability of the strip division in 1998 (Doc. No. 125 ¶ 50). Plaintiffs allege that Mr. Goy ("Goy"), an employee of Lincoln Partners, made presentations regarding the potential sale of the strip division at the Company's headquarters on April 7 and July 29 of 1998 (Doc. No. 112 ¶ 57), which Burns and Augustine attended[8] (Doc. No. 112 ¶ 58). Goy purportedly stated that the strip division could be marketed and a sale completed in 3½ to 7 months. (Doc. No. 125 ¶ 54.) Plaintiffs assert that Goy told Tako at the July 29, 1998 presentation that if the Company waited until March 1999 to sell the strip division, it would *likely* sell in the range of $15–$17 million.[9] (Doc. No. 112 ¶ 59.) Tako allegedly told Goy that it was in the Company's best interest to wait and sell the division. (Doc. No. 112 ¶ 55.)

In January 1999, the Company's Board of Directors approved Lincoln Partners to market the strip division, and Lincoln Partners was thereafter engaged on February 11, 1999 to sell it. (Doc. No. 100 ¶¶ 136, 138.) After being retained, Lincoln Partners listed 115 potential buyers. (Doc. No. 112 ¶ 91.) Plaintiffs allege that within days after the sale of their shares closed, Lincoln Partners began making contact with potential buyers (Doc. No. 112 ¶ 92). Plaintiffs further claim that within months after initiating contact with potential buyers, the Company received interest from six companies in a potential purchase of the strip division. (Doc. No. 112 ¶ 93.) By August 30, 1999, the Company had

entered into a letter of intent with a company named "Capital for Business" ("Capital") to sell the strip division for $22,236,000. (Doc. No. 112 ¶ 94.) However, the sale of the division to Capital was ultimately unsuccessful, and Lincoln Partners subsequently terminated its efforts to sell it in March 2000.

Plaintiffs assert that at "no time during the board meetings, the dinners with Tako, Augustine and Burns, or the extended negotiations with Augustine, did anyone tell John that the strip division alone had recently been valued as high as $18 million...."[10] (Doc. No. 112 ¶ 85.) Further, Plaintiffs maintain that John Gerrard would not have sold the family's shares in March 1999, or at least not at the price he did, if he had known there were plans to sell the strip division. (Doc. No. 112 ¶ 89.)

6. *Sale of the Company to Illinois Tool Works*

In May 2000, Tako had a conversation with Bob Williams ("Williams"), who was associated with Illinois Tool Works ("ITW"), concerning the Company (Doc. No. 100 ¶ 64), which eventually lead Kenneth Hoffman ("Hoffman"), group vice president of ITW, to send a confidentiality agreement to Tako around May 15, 2000 (Doc. No. 100 ¶ 65). Tako initially did not respond to the agreement (Doc. No. 100 ¶ 65), but after another incidental conversation with an ITW representative at an airport, Tako signed and returned the agreement to Hoffman on June 21, 2000

---

**8.** Defendants admit only that Goy gave a presentation on April 7, but they flatly deny that Burns and Augustine attended any presentation by Goy in 1998. (Doc. No. 125 ¶¶ 57, 58.)

**9.** Defendants deny that Goy ever stated that the strip division would *likely* sell, and Defendants explain that Goy stated that many factors could affect the success of the sale. (Doc. No. 125 ¶ 59.)

**10.** The $18 million dollar figure apparently derives from Plaintiffs' assertion that "Mr. Goy said that if management waited until the fall of 1998 to sell the strip division, the anticipated price range would be at its highest, $16–18 million for the strip division alone." (Doc. No. 112 ¶ 53.)

(Doc. No. 100 ¶ 66). Plaintiffs assert that Tako then proposed a meeting with ITW officials, which eventually took place on July 5, 2000. (Doc. No. 112 ¶ 102.)

At the July 5 meeting, Tako suggested a price of $140 million for the purchase of the Company. (Doc. No. 112 ¶ 106.) Without deciding immediately, ITW requested certain information, which Tako forwarded on July 13, 2000 (Doc. No. 100 ¶ 69); additional information was sent to Hoffman on July 20, 2000 (Doc. No. 100 ¶ 69). Soon thereafter, ITW approved the purchase of A.J. Gerrard & Company in a Board of Directors meeting held in August 2000 (Doc. No. 100 ¶ 70), and a letter of intent to purchase it for $125 million was sent to the Company on August 28 (Doc. No. 100 ¶ 71). The Company executed the letter of intent on August 31, 2000. (Doc. No. 100 ¶ 71.) On December 4, 2000, the transaction closed with ITW paying a per-share price, excluding escrowed funds, of $558.93 per share to purchase the entire Company. (Doc. No. 112 ¶ 107.)

## II.  *REQUIREMENTS FOR SUMMARY JUDGMENT*

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the facts in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw "all justifiable inferences in [its] favor...." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). How to carry this burden depends on who bears the burden of proof at trial. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). If the *movant* bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, ... no reasonable jury could find for the nonmoving party." *Four Parcels,* 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Jones v. City of Columbus,* 120 F.3d 248, 254 (11th Cir.1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. *Clark,* 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* Again, how to carry this burden depends on who bears the burden of proof at trial. If the *movant* has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. If the *non-movant* bears the burden of proof at trial, the non-movant must tailor

its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Fitzpatrick*, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross*, 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The clerk has given the non-moving parties notice (Doc. Nos. 98, 117, 118) of the summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. Therefore, the notice requirements of *Grif-*

*fith v. Wainwright*, 772 F.2d 822, 825 (11th Cir.1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motions are ready for consideration.

### III. *ANALYSIS*

■ Defendants have asserted that Plaintiffs' motion for summary judgment on Count I should be denied and this case dismissed for either one of two reasons. First, Defendants contend that Plaintiffs signed a stock purchase redemption agreement ("the Agreement") that bars all of their claims in the instant case. (Doc. No. 99 at 16–22.) Second, Defendants maintain that they are entitled to summary judgment on the claims because Plaintiffs cannot establish a necessary element of each cause of action.[11] (*Id.* at 4–16.) Because Defendants' contract defense would negate the need to address Plaintiffs' claims, I begin with it.

### A. Whether the Agreement Bars Plaintiffs' Claims

Defendants contend that on March 26, 1999, Plaintiffs and all of Defendants signed a stock purchase agreement along with other documents consummating the sale of Plaintiffs' shares. (*Id.* at 17–18.) The agreement contains a non-reliance clause,[12] a release of claims,[13] and a merger

11. Defendants stated in the hearing held on March 6, 2003 that "[a]ll of [the plaintiffs'] counts require five things that we are interested in." (Hearing Tr. at 75.) Defendants then listed the elements of a federal securities fraud claim. (*Id.*) As a result, Defendants have focused their motion for summary judgment on these elements rather than specifically discussing each particular cause of action in the complaint.

12. The relevant provision is as follows:
The Selling Shareholders have had a full and satisfactory opportunity to request, obtain and review all financial and other information which the Selling Shareholders have deemed necessary or desirable to evaluate the Company, its financial position, business prospects, and the transactions

herein described. The Selling Shareholders have made their own independent evaluation of the value of the Company and the Shares, and are not relying upon any representation of the Company or any of its shareholders, directors, officers, employees, representatives or agents in determining that they wish to proceed with the transactions herein described. The Selling Shareholders acknowledge that the Aggregate Purchase Price for the Shares has been negotiated at arm's length and that they believe that each of the Selling Shareholders is obtaining a fair and equitable price for the Shares.
(Stock Purchase Agreement ¶ 9(e).)

13. The contract language is as follows:
*Release of Claims.* Subject only to the terms and conditions of this Agreement, the

clause.[14] (Complaint at Ex. A.) Because these provisions were included in the final draft, which Defendants assert was negotiated at arm's length between the parties, Defendants argue Plaintiffs' claims must be dismissed. (*Id.* at 20–22.)

The Agreement provides that Georgia law governs in the event of a dispute. (Complaint at Ex. A ¶ 15(a).) Thus, although this case involves allegations of federal securities fraud, the *validity of the contract* is governed by Georgia law. *See Finn v. Prudential–Bache Securities Inc.,* 821 F.2d 581, 586 n. 5 (11th Cir.1987) (applying state law chosen by parties to determine validity of a release of federal securities law claims); *Pettinelli v. Danzig,* 722 F.2d 706 (11th Cir.1984) (applying state law to the issue of the validity of the release of federal securities law claims).

Under Georgia law, "[f]raud renders contracts voidable at the election of the injured party." O.C.G.A. § 13–5–5. Specifically, the Georgia appellate court has held that "[f]raud which constitutes a ground for voiding a contract under O.C.G.A. § 13–5–5 must be fraud which induced the parties to enter the contract." *Leventhal v. Seiter,* 208 Ga.App. 158, 162–63, 430 S.E.2d 378 (1993). Plaintiffs have specifically asserted in their briefs, as their allegations imply, that Defendants' fraudulent omissions induced them to enter the contract. (Doc. No. 145 at 24) ("[P]laintiffs were fraudulently induced to sell their shares because defendants made material misrepresentations and omissions concerning the plans for the Company and the value of the shares.").

Georgia decisional law has also specifically addressed the effect of a release provision or a merger clause in a contract when a plaintiff alleges fraud. The Court of Appeals has held that fraud allegations may justify a rescission of a written release from liability. *See Allen v. Sanders,* 176 Ga.App. 647, 648, 337 S.E.2d 428 (1985) (citing § 13–5–5 and stating that "[c]onstructive fraud, as well as actual fraud, voids [a] contract at the election of the injured party and may authorize a rescission of a written release from liability") (internal quotation marks omitted). In addition, a merger clause does not necessarily prevent a party from successfully asserting a fraud claim, as the Georgia Court of Appeals has explained:

Parties claiming fraudulent inducement have two remedies: rescind the contract as voidable or affirm the contract and

---

Selling Shareholders, for themselves and on behalf of each of their heirs and legatees, each hereby fully, finally and unconditionally release, acquit and forever discharge any and all liabilities, rights, claims, demands and causes of action against the Purchasers, the Company and any of its directors or officers, whether known or unknown, of any kind or nature whatsoever, arising out of or relating to any facts, transactions, occurrences or events existing prior to or as of the date of this Agreement, including, but not limited to, the sale or ownership of the Shares, past, current or future distributions by the Company or rights and privileges granted by the Company, the operation of the Company, and/or acts taken or failed to be performed by any of the officers or directors of the Company.
(Stock Purchase Agreement ¶ 11.)

14. The clause provides as follows:
This Agreement, and the documents executed and delivered pursuant hereto, contain the entire agreement of the parties and supercedes all prior negotiations, representations, warranties, understanding, and agreements with respect to the matters addressed in this Agreement. This Agreement may be modified and rescinded only by a written instrument signed by all the parties thereto.
(Stock Purchase Agreement ¶ 15(d).)

sue for damages. A party that rescinds is not limited by the contract terms. If, however, the party decides to affirm and sue on the contract, the contract terms control, and the party is bound by any merger clause or disclaimer.

*Sudler v. Campbell*, 250 Ga.App. 537, 540, 550 S.E.2d 711 (2001); *see also Hall v. Coram Healthcare Corp.*, 157 F.3d 1286, 1289 (11th Cir.1998) ("Georgia law is clear that plaintiffs have two options available against a defendant for alleged misrepresentations in a contract action: a plaintiff can affirm the contract and sue for damages, in which case the merger clause applies, or the plaintiff can rescind the contract and sue in tort for alleged fraud, and the merger clause does not prevent introduction of parole evidence."). Because Count VII of Plaintiffs' Complaint asks that the Stock Purchase Agreement be rescinded, the merger clause cannot bar evidence of Defendants' alleged fraudulent conduct and, thus, cannot bar a claim for fraud, regardless of whether it is made pursuant to federal or state law.

Finally, I note that the Georgia Supreme Court has not exempted securities-fraud cases from the above-stated rules. *See Meason v. Gilbert*, 236 Ga. 862, 226 S.E.2d 49 (1976). In *Meason,* the Court addressed a securities fraud case involving a contract for the sale of securities that contained both merger and non-reliance language.[15] The purchaser in that case argued that he had been induced to purchase certain securities because of fraudulent *oral* misrepresentations by the defendants' agent. *Id.* at 863, 226 S.E.2d 49. Despite the contract language stating that he had relied solely on the written prospectus and that the written contract constituted the parties' entire agreement, he brought suit under the Georgia Securities Act. *Id.* Citing federal securities law,[16] the Court reasoned that "[t]o allow a purchaser to waive by contract at the time of purchase all violations of the Securities Act would eviscerate the very protections afforded by the statute and such a purported waiver would be void and of no effect." *Id.* The Georgia Supreme Court's opinion persuades me that alleged fraud in the securities context does not alter the application of general contract principles in Georgia. (*See, e.g.,* Hearing Tr. at 125–131.)

Because the contract is not a bar to Plaintiffs' assertion that Defendants engaged in fraudulent conduct, I must now address whether (1) Plaintiffs have provided sufficient evidence to sustain their fraud claim as a matter of law, or (2) whether Defendants are entitled to summary judgment.

**15.** The purchase contract contained the following language:

> The (purchaser) understands and agrees that his purchase hereunder is and will be made solely on the basis of information contained in said prospectus. The (purchaser) further agrees that said prospectus and this purchase agreement contain the entire contract between the (purchaser) and the company and that he relied on no representations, warranties or statements of any kind whatsoever with respect to the company or the shares purchased hereunder not set forth in said prospectus.
> *Meason v. Gilbert,* 236 Ga. 862, 863, 226 S.E.2d 49 (1976).

**16.** *See Meason v. Gilbert,* 236 Ga. 862, 864, 226 S.E.2d 49 (1976) ("The language in this statute is similar to that contained in the 1934 Federal Securities and Exchange Act anti-fraud provision and Rule 10b–5. Therefore, the language of cases involving the federal securities law is helpful in deciding this case.") (footnote omitted).

## B. Plaintiffs' Motion for Summary Judgment

Plaintiffs have filed a motion for partial summary judgment on Count I of the Complaint. (Doc. No. 110.) Count I alleges that Defendants have violated 15 U.S.C. § 78j(b) and SEC Rule 10b–5. Section 78j provides, in pertinent part, as follows:

It shall be unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement . . . *any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.*

15 U.S.C. § 78j(b) (emphasis added). Pursuant to its authority, the Securities and Exchange Commission promulgated Rule 10b–5. 17 C.F.R. § 240.10b–5. Rule 10b–5 provides as follows:

It shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*Id.* In tandem, section 78j and Rule 10b–5 provide plaintiffs a private cause of action for securities fraud. *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1281 (11th Cir.1999).

To establish securities fraud, "a plaintiff must show: 1) a misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury." *Id.* In the instant case, if Plaintiffs cannot establish uncontroverted facts to support each element of their claim, their motion for summary judgment must fail.

For the reasons explained hereafter, Plaintiffs' motion must fail because a genuine issue of material fact remains on the question of whether (1) John Gerrard relied on the allegedly omitted information, and (2) whether such reliance was justifiable.

### 1. *The Omission Element*

Plaintiffs have focused their motion for summary judgment on the alleged *omission* of material information regarding A.J. Gerrard & Company. (Doc. No. 111 at 15.) Specifically, Plaintiffs allege the following:

[Defendants] contacted an investment banker in late 1997 or early 1998 to sell the strip division. By July 29, 1998 [Defendants] learned the value of the single division was $18 million and could be sold in as little as 3–1/2 months. This information was not disclosed to John, even though between June and September 1998 he was with [Defendants] at two board meetings and a dinner meeting and subsequently negotiated the price of the shares with Augustine.

(*Id.* at 15 (arguing the element of omission).) Defendants, however, contend that Anthony Tako ("Tako") "spoke with John Gerrard about the Company's desire to sell the strip division in January 1998." (Doc. No. 158 at 11 (citing Tako Aff. ¶ 10).)

■ Plaintiffs contend, correctly, that this evidence does not help Defendants. (Doc. No. 150 at 4–7.) Even if Tako made such a statement to John Gerrard, this still does not ameliorate his omission to tell John Gerrard that Lincoln Partners had

been hired to estimate the market range of the strip division or that Lincoln Partners had determined that the strip division was worth anywhere from $10–$18 million. (Goy Dep. at Ex. 1 (Lincoln Partners' evaluation of the value of the strip division).) Defendants have provided no other evidence that they informed John Gerrard of this information. Therefore, Plaintiffs have established an omission.[17]

## 2. *Reliance* [18]

### a. *Applicable Law*

"To state a cause of action under Section 10b of the Exchange Act or Rule 10b–5, plaintiffs must be able to demonstrate reliance on a material misrepresentation or omission...." *Hall v. Coram Healthcare Corp.*, 157 F.3d 1286, 1288 (11th Cir.1998). However, the Eleventh Circuit has explained that "the burden of proving or disproving reliance may shift depending on the nature of the case," *Shores v. Sklar*, 647 F.2d 462, 468 (5th Cir.1981),[19] meaning that cases involving allegations of non-disclosure of material information treat the burden of coming forward with evidence on the reliance element differently than cases involving affirmative misrepresentations. Thus, "[i]deally, a trial court should characterize a Rule 10b–5 case as either being a 'misrepresentation' case or an 'omission' case, in order to determine whether the plaintiffs retain the burden of

---

17. "A failure to disclose material information is actionable only when the defendant had an affirmative duty to disclose [the] facts...." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir.2001). While materiality is a separate element that Plaintiffs must establish, Defendants in this case were under a duty to disclose all material information to John Gerrard. As the *Castellano* court stated, "under § 10(b) and Rule 10b–5, *closed corporations that purchase their own stock have a special obligation to disclose to sellers all material information.*" *Id.* (emphasis added). Furthermore, there is little doubt that insiders have a duty to disclose material information before engaging in a transaction to purchase company shares. Importantly, the term "insiders", is not a label applied only to a company's officers. Rather "[t]he term 'insider' is simply a shorthand description of those people who, by reason of their activities within a corporation, have access to information capable of being exploited, or information that would negate the harmful effects of a non-disclosure or misrepresentation." *Rosenbloom v. Adams, Scott & Conway, Inc.*, 552 F.2d 1336, 1338–39 (9th Cir.1977). Thus, though the parties have not discussed in their briefs whether each individual defendant was under a duty to disclose, an individual with insider information would have been under such an obligation before purchasing the Gerrard family's shares. *See In re Gen. Motors Class E. Stock Buyout Securities Litigation*, 694 F.Supp. 1119, 1129 (D.Del.1988) ("[A]n insider who trades on material information has a duty to disclose that information because failure to do so constitutes fraud under Rule 10b–5.") (internal quotation marks omitted); *Chiarella v. United States*, 445 U.S. 222, 230 n. 12, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) (" 'Tippees' of corporate insiders have been held liable under § 10(b) because they have a duty not to profit from the use of insider information that they know is confidential and know or should know came from a corporate insider. The tippee's obligation has been viewed as arising from his role as a participant after the fact in the insider's breach of a fiduciary duty.").

18. Reliance is also sometimes referred to as "transaction causation." *See Robbins v. Kroger Properties*, 116 F.3d 1441, 1447 (11th Cir. 1997) ("To prove the causation element, a plaintiff must prove both 'transaction causation' and 'loss causation.' Transaction causation, *another way of describing reliance*, is established when the misrepresentations or omissions cause the plaintiff to engage in the transaction in question. As such, transaction causation is akin to actual or 'but for' causation.") (some internal quotation marks omitted) (citations omitted) (emphasis added).

19. In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.

proving the reliance element, or the plaintiffs are relieved by the *Ute* presumption of reliance." *Cavalier Carpets, Inc. v. Caylor,* 746 F.2d 749, 756 (11th Cir.1984) (citing *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)).

█ Plaintiffs have focused their motion on the omission of material information concerning the Lincoln Partners Report and the subsequent valuation of the strip division; thus, this is an omission case. As a result, the United States Supreme Court has removed Plaintiffs' initial burden of coming forward with evidence of reliance: "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [his investment] decision." *Affiliated Ute Citizens,* 406 U.S. at 153–54, 92 S.Ct. 1456; *Ross v. Bank South,* 885 F.2d 723, 728 (11th Cir.1989) ("[I]n the case of an omission rather than a misstatement reliance may be presumed when the plaintiffs could justifiably expect that the defendants would have disclosed the material information.").[20]

█ However, the Court of Appeals has explained that the Supreme Court's *Ute* opinion is not to be read too broadly:

> *Ute* did not eliminate reliance as an element of a 10b–5 omission case; it merely established a presumption that made it possible for the plaintiffs to meet their burden. When the *Ute* presumption attaches, the defendant may rebut it by showing that the plaintiff did not rely on

the defendant's duty to disclose. If the plaintiff would have followed the same course of conduct even with full and honest disclosure, then the defendant's action (or lack thereof) cannot be said to have caused plaintiff's loss.

*Shores,* 647 F.2d at 468. I begin, therefore, assuming that Plaintiffs need not initially come forward with evidence to establish the reliance element of their Rule 10b–5 case. Rather, Defendants must present evidence that John Gerrard's decision to sell his family's shares at the agreed price would not have changed even had he known the omitted information. If Defendants provide this evidence, then John Gerrard must come forward with rebuttal evidence. If he does, then a factual question for the jury is presented.

### b. Analysis of Plaintiffs' Reliance

█ Defendants have come forward with ample evidence for a reasonable jury to find that John Gerrard would have sold his family's shares regardless of Defendants' omission. First, Defendants have provided evidence that John Gerrard made a habit of selling any stock he acquired:

A. [John Gerrard] I sold stock all over my adult life.

Q. Can you tell me why you moved from 7,000 some shares down to 50 in the early 80's, why did you do that?

A. Because I sold stock.

Q. And why were [you] selling stock?

A. Because I wanted to.

to the defendant. The presumption vanishes whenever the evidence would permit the trier of fact to conclude that the omitted information would not have affected the plaintiffs' decision to enter into the transaction in question.

*Cavalier Carpets, Inc. v. Caylor,* 746 F.2d at 755 n. 19.

---

**20.** The Eleventh Circuit has explained that the ultimate burden of persuasion is not shifted in omission cases; rather, it is the burden of coming forward with evidence that has shifted:

> *Ute* does not shift the burden of proof, i.e., the risk of nonpersuasion, to the defendant in an omission case; rather, it simply shifts the burden of going forward with evidence

Q. Did you consider retaining your shares rather than selling them through—during that time period?

A. Well, it was a way for me to get money.

(John Gerrard Dep. at 42.) Defendants have further provided evidence that John Gerrard's company, Moore–Lambert Lighting, was struggling financially at the time of the stock sale. (*Id.* at 50.) In addition, John Gerrard had some personal debt, and he stated that he used some of the money he received in March 1999 from the Gerrard-family stock sell-off to pay that debt. (*Id.* at 159.) Based on the above evidence, a jury could find that John Gerrard's willingness to sell his stock coupled with his personal and business debts may have lead him to sell the stock, even with knowledge of the omitted information.

In addition, Defendants have provided evidence that John Gerrard, as trustee of the Roberta F. Gerrard trust, which contained the family shares, had a duty to the beneficiaries of the trust. (*Id.* at 53–54.) Specifically, John Gerrard testified that he felt it was his duty to "enhance the earnings of that Trust[.]" (*Id.* at 54.) He further testified that he was dissatisfied with the lack of income production of the company shares. (*Id.* at 156 ("I had stocks, my sister had stock that really wasn't doing anything or going anywhere.").) A jury could find that John Gerrard might have made a decision to sell the shares to reinvest them in something more profitable rather than risk holding them without a guarantee that they would produce income. Indeed, when John Gerrard was asked whether he had told anyone that he "wanted to take advantage of the high level performance of the stock market rather than hold privately held shares" (*id.* at 159), he responded that he thought he might have "said something to

either Burns or Augustine on the night of [their] dinner [that] that's what [he] would end up doing with some of [the] money" (*id.*). He then testified that he did in fact invest some of the money in the stock market. (*Id.* at 160.) Finally, John Gerrard gave the following testimony:

Q. Okay. Did you consider selling just a portion of your shares and your family shares for $71.50 and holding on to the rest of those shares?

A. No, *we were pretty much determined as a group that we would go on to sell them, sell it and get out of it.*

Q. And when did that determination get made?

A. I don't remember exactly when.

Q. Okay. Why was that determination made?

A. *Why stay around.* I had already been told at one point by telling me that something about being a big fish in a little pond and a little fish in a big pond. And I took that to mean you don't want to be a minority stockholder in this company. And—you've got to understand that Gerrard had been part of my life forever. *And at that point the selling was—we just decided to sell it all.*

(*Id.* at 161–62 (emphasis added).) A reasonable jury might find that John Gerrard had concretely decided to sell his shares, and that no uncertain prospective event would have likely changed his mind. Defendants have rebutted Plaintiffs' presumption of reliance. However, John Gerrard has filed an affidavit stating that he would not have sold his family shares had he known the omitted information.[21] (First John Gerrard Aff. ¶ 30.) The reso-

---

21. Defendants' objections to portions of John Gerrard's first and third affidavit were denied in the Court's Order of even date. (Doc. No. 160.)

lution of whether John Gerrard would have held onto his shares had he known the omitted information is for a jury.

At this juncture, I must now address the related question of whether the plaintiffs' reliance, even if proved, is justifiable. If not, then the defendants must prevail as a matter of law.

### c. Analysis of Whether the Plaintiffs' Reliance was Justifiable

The Eleventh Circuit has explained that a plaintiff's reliance must be justifiable. *Bruschi v. Brown,* 876 F.2d 1526, 1529 (11th Cir.1989). The Court has set forth the following considerations when making this determination:

> [W]hether an investor's reliance was justified requires the consideration of all relevant factors, including: (1) the sophistication and expertise of the plaintiff in financial and security matters; (2) the existence of long standing business or personal relationships between the plaintiff and the defendant; (3) the plaintiff's access to relevant information; (4) the existence of a fiduciary relationship owed by the defendant to the plaintiff; (5) concealment of fraud by the defendant; (6) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and [ (7) ] the generality or specificity of the misrepresentations. No single factor is dispositive; all must be considered and balanced in determining whether reliance was justified.

*Id.* (citations omitted). Plaintiffs have provided ample evidence that their reliance was justifiable. First, John Gerrard admitted in his deposition that (1) he lacked training in business matters and (2) that he found it difficult to read and understand financial statements. (John Gerrard Dep. at 51.) Furthermore, John Gerrard stated that he felt he could trust the Board members and, in fact, Anthony Tako delivered the eulogy at John Gerrard's father's funeral. (*Id.* at 67, 71.) John Gerrard maintained that he and Tako were friends. (*Id.* at 74, 133). Consistent with his testimony, John Gerrard stated the following about the sale of his family's stock:

Q. Okay. All right. Did you have any advisors in the sale of your stock?

A. The only advisors I felt that I had were, the people on the board with the company.

Q. Okay. People outside the company, is what I'm asking about? For example, Mr. Mobley.

A. He was not an advisor in any of the negotiations of the price or-and after the price was established and so to speak the deal as [a] handshake deal. And then at that point, Russell Mobley and Tom Palmer went to work putting together [an] agreement so I could sell the stock.

(*Id.* at 130–31.) Gerrard also agreed in his deposition that it was difficult to get information about the financial condition of the company. (*Id.* at 130.) Of course, as a shareholder in this close corporation, the board members had a fiduciary duty to John Gerrard. *Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 179 (2d Cir. 2001) ("[U]nder § 10(b) and Rule 10b–5, closed corporations that purchase their own stock have a special obligation to disclose to sellers all material information."). Based upon the foregoing, Plaintiffs have presented sufficient evidence to avoid summary judgment in Defendants' favor on this element. Ultimately, a jury will have to decide the extent of John Gerrard's relationship with Tako and the board members and the sophistication of John Gerrard's business skills.

### d. Result of Plaintiffs' Motion

Because a jury question is presented on whether John Gerrard would have made

the same decision to sell his family's shares at the agreed price, even with the benefit of the omitted information, and whether his reliance was justified, Plaintiffs' motion for summary judgment is **DENIED.**

## C. Defendants' Motion for Summary Judgment

Since Defendants do not bear the burden of proof at trial, they may prevail on their summary judgment motion if they negate an essential element of the Plaintiffs' case or if they can show that there is no evidence to prove a fact necessary to Plaintiffs' case. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, I proceed with the remaining elements of Plaintiffs' Rule 10b–5 case to reach a conclusion on Defendants' motion for summary judgment.

### 1. *Scienter*

■ "Scienter, 'a mental state embracing intent to deceive, manipulate, or defraud,' is a vital element of a Section 10(b) or Rule 10b–5 claim." *Cameron v. Outdoor Resorts of Am., Inc.,* 608 F.2d 187, 193–94 (5th Cir.1979) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 & n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Furthermore, the "rule in this circuit is that 'severe recklessness' satisfies the scienter requirement." *Magna Inv. Corp. v. John Does,* 931 F.2d 38, 39 (11th Cir.1991) (per curiam). "Severe recklessness" has been defined as follows:

> "Severe recklessness" is limited to those highly unreasonable omissions or misrepresentations that involve no merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers

which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989) (internal quotation marks omitted) (quoting *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir.1981) (en banc)). Finally, scienter requires that an insider have possession of material nonpublic information at the time the insider trades. *SEC v. Adler,* 137 F.3d 1325, 1340 (11th Cir.1998).

■ The evidence adduced by Plaintiffs demonstrates that Defendants knew (1) Lincoln Partners' valuation of the strip division and (2) the plans of the Company to sell that division before they bought the Gerrard family shares. (Goy Dep. at 5, 9.) Indeed, the Company board approved the retention of Lincoln Partners to actively market the strip division before the Gerrard family shares were sold. Notably, "proof of an insider's possession of material nonpublic information at the time of a trade gives rise to a strong inference of use." *SEC v. Adler,* 137 F.3d at 1340.

John Gerrard has filed an affidavit stating that he was first approached in August 1998 about purchasing the family's shares, several months after Goy first gave his presentation on the value of the strip division and his opinion on its marketability. (First John Gerrard Aff. ¶ 26; Third John Gerrard Aff. ¶ 11.) In addition, John Gerrard stated that he was told by Anthony Tako that he did not need to attend the January 1999 board meeting, which was when the board decided to retain Lincoln Partners to sell the strip division. (First John Gerrard Aff. ¶ 13.) In addition, the Company did not send John Gerrard an agenda of the meeting as it had with the prior two meetings that he had attended. (*Id.* ¶ 15.) Despite the presentation by Lincoln Partners and the interest by many of Defendants in buying the Gerrard fami-

ly's shares, John Gerrard states that (1) he was not told that the Company had been meeting with an investment banker (*Id.* ¶ 27), (2) that the strip division had been valued as high as $18 million (*id.* ¶ 31), or (3) that the Company intended to market the strip division (*id.* ¶ 33).

Finally, the evidence indicates a large increase in share ownership by many of Defendants subsequent to Lincoln Partners' evaluation and the Company's retention of it to sell the strip division: (1) Augustine: 218%; (2) Burns: 7,954%; (3) Ehlert: 1,818%; (4) McMahon: 72%; (5) Peterson: 40%; (6) Turano: 2,513%; and (7) Wolf: 93%.[22] (*Id.* ¶ 36.) A reasonable trier of fact could find the insiders intentionally delayed the sale of the strip division until they could acquire the Gerrard family's shares for their own benefit.

While a jury may not find that these events are related, Plaintiffs have produced enough evidence to survive summary judgment.

### 2. *Materiality*

#### a. *Applicable Law*

■■■■■ To satisfy the materiality requirement, "there must exist a substantial likelihood that the disclosure of [any] omitted fact would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information made available." *In re Gen. Motors Class E. Stock Buyout Securities Litigation,* 694 F.Supp. 1119, 1127 (D.Del.1988) (internal quotation marks omitted) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). The

Southern District of New York has further explained that although an "omitted fact must have been one that would have assumed actual significance in the reasonable shareholder's decision-making process, there is no requirement that the fact would have been outcome determinative. Thus, a fact may be material even if it would not have changed an investor's ultimate decision." *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* 185 F.Supp.2d 389, 399 (S.D.N.Y.2002). If an omitted fact is so trivial or so basic that any investor could be expected to know it, then the fact will be considered immaterial. *Id.* (internal quotation marks omitted). However, "[m]aterial facts include those that affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities." *Castellano,* 257 F.3d at 180.

■■■■ "It is clear that some facts are deemed material even though they refer to a prospective and, therefore, contingent event provided there appears to be a reasonable likelihood of its future occurrence." *SEC v. Mize,* 615 F.2d 1046, 1051 (5th Cir.1980). More specifically, the materiality of facts relating to a prospective event "depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Castellano,* 257 F.3d at 181. To make this determination, the probability of a transaction occurring must be based on the facts as they then existed and the fact that a transaction occurs cannot be determinative of the materiality of pro-

**22.** John Gerrard's affidavit states that the number of shares owned by each Defendant prior to the Gerrard-family stock sale are based on A.J. Gerrard & Company documents dated October 17, 1997, and that the figures for the numbers of shares owned by a particular defendant after the stock sale includes any shares owned by a spouse. (John Gerrard Aff. at 6.) I note that Richard Louis, Anthony Tako, Richard Neville, and Robert J. Zuponeck apparently did not purchase any of the plaintiffs' shares, though there is no indication that they were unaware of the omitted information upon which the plaintiffs base their fraud claims.

spective events. *In re Gen. Motors Class E Stock,* 694 F.Supp. at 1127.

The determination of materiality is a mixed question of law and fact. *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985). Furthermore, the determination of materiality "requires delicate assessment of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessment are *peculiarly one for the trier of fact.*" *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (emphasis added); *see Mize,* 615 F.2d at 1053.

### b. Analysis

The facts Plaintiffs have argued to comprise the material omissions or misrepresentations have changed over the course of this litigation and have caused some confusion. For example, Plaintiffs' briefs in support of their motion for summary judgment state that there were essentially two *omissions* which were the basis of the fraud allegations in this case: (1) the omission to inform Plaintiffs of the discussions and plans related to the sale of the strip division; and (2) the omission of the evaluations compiled by Lincoln Partners that provided the monetary valuations of the strip division. Defendants' brief in support of their motion for summary judgment, however, demonstrates some effort was expended in discussing the ITW transaction, a transaction Plaintiffs apparently no longer argue was the basis of their fraud claims. (Doc. No. 99 at 5–10.)

The disconnect in the motions and the arguments stems from the shifting nature of this case. The Complaint focuses on the ITW transaction, yet as the case and discovery progressed, Plaintiffs' focus retreated in time to the events involved in the potential strip division sale and the

Lincoln Partners' evaluation. Indeed, Plaintiffs' motion for summary judgment is not based on the ITW transaction. The result of this evolution is that Defendants' brief focuses its materiality argument, at least in part, on the events Plaintiffs have seemingly abandoned as supportive of the fraud claims. Much of Michael Easterly's expert testimony, which was challenged by Defendants,[23] concerning whether all three divisions of the company were in reality for sale is attributable to Plaintiffs' original intention to prove that Defendants knew that the entire company was for sale and that the ultimate result was the ITW transaction.

Plaintiffs have had a generous opportunity to conduct discovery and present evidence to support their claims. Now the case must be narrowed to its triable issues. Thus, the omissions Plaintiffs have set forth in their brief in support of their motion for summary judgment are the omissions upon which I base my materiality assessment. Those omissions, as set forth by Plaintiffs, are as follows:

> The Insiders contacted an investment banker in late 1997 or early 1998 to sell the strip division. By July 29, 1998 the Insiders learned the value of the single division was $18 million and could be sold in as little as 3½ months. This information was not disclosed to John [Gerrard], even though between June and September 1998 he was with the Insiders at two board meetings and a dinner meeting and subsequently negotiated the price of the shares with Augustine.

(Doc. No. 111 at 15.)

In *Castellano,* the Second Circuit determined that the materiality of evaluative material produced by an investment banking firm was directly tied to the materiali-

---

**23.** The Court has granted in part and denied in part Defendants' challenge to the expert testimony. See Order of even date. (Doc No. 160.)

ty of the discussions the defendant had with a potential investor that precipitated the evaluations. 257 F.3d at 186 ("[W]e find a question is also presented for the factfinder regarding the materiality of the Bears Stearns [the investment banking firm] recommendations and the materiality of the valuation analyses prepared by Bear Stearns in connection with the Forstmann Little [the potential investor] discussions."). Stated differently, whether the evaluations were material is related to whether the discussions with the potential investor were material. Similarly, if the plans and discussion regarding the potential sale of the strip division are material, then all the information related to those plans and discussions, such as the Lincoln Partners evaluation, is material.

Because the sale of the strip division was a prospective event at the time relevant to this litigation, I must determine whether Plaintiffs have provided evidence of the sale's probability and its magnitude sufficient to preclude summary judgment in favor of Defendants. In looking at the indicia of the probability of a sale, I am not constrained to consider only expert testimony, though it is relevant. Board resolutions, actual (as opposed to potential) negotiations, instructions to investment bankers, the existence of confidentiality agreements, and the expenditure of time in performing "due diligence" may all indicate a potential transaction. *See Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240, 244 (4th Cir.1988) (finding that the predicates for a merger were not in place because there was "no evidence of board resolutions, actual negotiations, or instructions to investment bankers to facilitate a merger"); *Castellano*, 257 F.3d at 185 ("Y & R's engagement of law firms and investment bankers, and the parties'

entrance into a confidentiality agreement and extensive due diligence [indicate] the district court appropriately refused to hold the Forstmann Little discussions immaterial as a matter of law."). After an examination of the evidence, many of these factors preclude me from determining that the sale of the strip division was improbable as a matter of law.

First, Patrick Goy ("Goy"), an investment banker with Lincoln Partners, testified that he was hired in late 1997 or early 1998 to make an evaluation of the marketability and value of the strip division. (Goy Dep. at 5, 9.) Thus, approximately a year before Plaintiffs sold their stock shares, A.J. Gerrard & Company had begun evaluating whether the strip division could be sold. In April 1998, Goy gave his first presentation to the Company regarding the valuation and marketability of the strip division. (*Id.*) The plans to sell the strip division continued to progress as Lincoln Partners was formally retained to sell strip division on February 11, 1999. (*Id.* at 16.) By March 23, 1999, a list of 115 potential buyers was produced. (*Id.* at 21.) On March 26, 1999, Plaintiffs completed the sale of their shares. The next month, April 1999, Lincoln Partners contacted 95 potential partners, and shortly thereafter 21 of the potential buyers submitted confidentiality agreements. (*Id.* at 23.) No more than 60 days after Plaintiffs sold their shares, six companies submitted indications of interest in the division. (*Id.*) The circumstances of Lincoln Partners' activities alone would foreclose deeming the sale improbable, but there is more evidence of the probability of the sale.

The board of directors discussed and apparently approved the marketing of the strip division in its January 1999 meeting in Mexico[24] (Hearing Tr. at 25–26), and

---

24. At oral argument, Plaintiffs' counsel stated that John Gerrard did not attend the meeting in Mexico and that the minutes from the meeting were not put into written form until months after the Gerrard-family stock sale concluded. (Hearing Tr. at 171–72.)

the parties agree that shortly before Capital for Business made an offer for the strip division, certain board members and the Company bought all of Plaintiffs' 35,000 shares, which a jury may find indicates that the sale was likely to occur. (Doc. No. 100 ¶¶ 54, 55, 57.) Finally, Goy testified that at the time Lincoln Partners was retained, he did not feel the sale of the strip division was a remote possibility. (*Id.* at 30.) In summary, there is a question of fact regarding the probability of the sale of the strip division. I cannot deem that the sale of the strip division was of little importance in the totality of the company activity. First, the Company was divesting itself of one of its divisions and apparently getting out of the business of producing metal straps and tubing. (*See* Hearing Tr. at 19–20 (describing the operations of the strip and strap divisions).) Furthermore, the strip division was valued between $10 million and $18 million, (Goy Dep. at 10), even though the book value of the company was only $19.6 million. (Hearing Tr. at 19.) These facts preclude me from deeming the sale of the strip division as insignificant and granting Defendants' motion for summary judgment. In reaching my decision, I am mindful that "materiality is ordinarily best left to the trier of fact...." *In re Cirrus Logic Securities Litigation*, 946 F.Supp. 1446, 1456 (N.D.Cal.1996).

### 3. *Proximate Cause*

■ To succeed on their federal securities fraud claim, Plaintiffs must show that their loss was proximately caused by the omission of Defendants. *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. Unit A Mar.1981) ("The plaintiff must prove not only that had he known the truth he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate way responsible for his loss."). Stated differently, Plaintiffs must show loss causation. *See*

*Bruschi v. Brown*, 876 F.2d 1526, 1530 (11th Cir.1989). The Eleventh Circuit has held that "[l]oss causation requires a showing that the misrepresentations or omission caused the economic harm.... In other words, a plaintiff must demonstrate that the defendants' fraudulent conduct 'touches upon the reasons for the investment's decline in value.'" *Currie v. Cayman Res. Corp.*, 835 F.2d 780, 785 (11th Cir.1988) (quoting *Huddleston*, 640 F.2d at 549) (some internal quotation marks omitted) (citation omitted). "Absent the requirement of [loss] causation, Rule 10b–5 would become an insurance plan for the cost of every security purchased in reliance upon a material misstatement or omission." *Huddleston*, 640 F.2d at 549.

Essentially Plaintiffs argue that the omission of the material information on the value of the strip division and the plans to sell that division resulted in the sale of their stock at an unfair and undervalued price. Thus, the moment the shares exchanged hands, Plaintiffs maintain that they suffered a loss. In his deposition testimony, John Gerrard specifically stated that he felt the price he received for his family's shares was unfair. (John Gerrard Dep. at 10.) Furthermore, in his affidavit, John Gerrard specifically stated the following: "I would not have sold my family's shares in March 1999, and certainly not for $2.5 million, if I had known there were plans to sell the smallest division, the strip division, for $18 million." (John Gerrard Aff. ¶ 30.) This testimony is sufficient to preclude summary judgment for Defendants on the issue of proximate cause.

### 4. *Result of Defendants' Motion for Summary Judgment*

For the reasons stated above, Defendants' motion for summary judgment is **DENIED.** Plaintiffs' case must be presented to a jury for a final determination.

## IV. CONCLUSION

For the aforementioned reasons, both Plaintiffs' motion (Doc. No. 110) and Defendants' motion (Doc. No. 97) for summary judgment are **DENIED.** This case will proceed to trial.